Michelle B. WADZINSKI, individually and
as personal representative of
the Estate of
Steven M. Wadzinski,
Plaintiff-Appellant,†

v.

AUTO-OWNERS INSURANCE COMPANY,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2009AP2752. Oral argument January 10, 2012.
—Decided July 5, 2012.*

**2012 WI 75**

(Also reported in 818 N.W.2d 819.)

† Motion for reconsideration denied 9/28/12.

316

For the defendant-respondent-petitioner there were briefs filed by *Arthur E. Kurtz, Timothy M. Barber* and *Axley Brynelson, LLP,* Madison, and oral argument by *Arthur E. Kurtz.*

For the plaintiff-appellant there were briefs filed by *R. George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, and oral argument by *R. George Burnett.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J.   This is a review of a published decision of the court of appeals.[1] That court reversed the decision of the circuit court,[2] which had granted summary judgment in favor of Auto-Owners Insurance Company. The sole question for review is whether a reasonable insured would read the Executive Umbrella insurance policy at issue here to afford $2,000,000 of uninsured motorist (UM) coverage.

¶ 2.   This case arose from a fatal motorcycle accident in which Steven Wadzinski was struck and killed by an uninsured motorist. Mr. Wadzinski's wife, Michelle Wadzinski, seeks UM coverage under an umbrella insurance policy that Mr. Wadzinski's company carried on him at the time of his death. The primary dispute centers on the meaning of an endorsement to the Executive Umbrella policy, and whether that endorsement causes contextual ambiguity such that a reasonable insured would expect $2,000,000 of UM coverage under the policy. The circuit court held that

---

[1] *Wadzinski v. Auto-Owners Ins. Co.,* 2011 WI App 47, 332 Wis. 2d 379, 797 N.W.2d 910.

[2] The Honorable William M. Atkinson of Brown County presided.

the Executive Umbrella policy was clearly intended to provide only third-party liability coverage and granted summary judgment in favor of Auto-Owners. The court of appeals reversed the circuit court, concluding that the Executive Umbrella policy was contextually ambiguous, and therefore, the policy should be construed in favor of the insured to afford coverage.

¶ 3. We conclude that the Executive Umbrella policy at issue does not afford first-party UM coverage. The policy's grant of coverage unambiguously provides only excess third-party liability coverage. Further, the language and structure of the endorsement to the Executive Umbrella policy demonstrate that the endorsement reaffirms the umbrella policy's exclusion of first-party coverage. Additionally, an exception to that exclusion clarifies that the exclusion is not intended to interfere with first-party coverage in other Auto-Owners policies that are referred to in Schedule A. Accordingly, we conclude that the circuit court's summary judgment in favor of Auto-Owners was proper, and therefore, we reverse the decision of the court of appeals.

## I. BACKGROUND[3]

¶ 4. On August 3, 2006, Steven Wadzinski was struck and killed by an uninsured motorist while he was riding a motorcycle. At the time of the accident, Mr. Wadzinski was the Chief Executive Officer of Pecard Chemical Company, Inc., which had purchased multiple insurance policies through Auto-Owners. In the Commercial Auto Insurance policy (No. 41–321–013–00), Pecard Chemical is the named insured. That policy's grant of coverage provides $1,000,000 in third-party

[3] The underlying facts of this case are not in dispute.

automobile liability coverage, as well as first-party coverage for UM and underinsured motorist (UIM) benefits. Each line of coverage (UM & UIM) affords $150,000 per person or $300,000 per occurrence of first-party coverage. The total premium for the Commercial Auto policy is $1,371.84.[4] Pecard Chemical is also the named insured under the Commercial Umbrella policy (No. 96–886–558–00), which policy's grant of coverage provides up to $5,000,000 in third-party liability coverage. The annual premium for the Commercial Umbrella policy is $2,923. The Commercial Umbrella policy specifically excludes UM and UIM coverage.[5]

¶ 5.   In a third Auto-Owners policy, the Executive Umbrella policy, Mr. Wadzinski is the named insured. The Executive Umbrella policy shares a policy number with the Commercial Umbrella policy under which Pecard Chemical is the named insured. The Executive Umbrella policy, whose language is now at issue, provides $2,000,000 in excess coverage over the underlying policies that are listed in Schedule A. Those underlying policies are a Comprehensive Personal Liability policy (not at issue here) and an Automobile Liability policy with a $500,000 minimum coverage requirement. The annual premium for the Executive Umbrella policy is $234.

---

[4] The Commercial Auto policy also includes other types of coverage not relevant here.

[5] The Commercial Umbrella policy's UM exclusion provided that coverage under the policy did not apply to "[b]odily injury or property damage arising out of uninsured motorist, underinsured motorist, automobile no-fault, personal injury protection or any other similar law." The parties do not dispute that this exclusion precludes recovery of payments for UM coverage under the Commercial Umbrella policy.

320

¶ 6. After Mr. Wadzinski's death, Auto-Owners paid Wadzinski's estate the limits of the Commercial Auto policy's UM coverage, $150,000. When Auto-Owners refused the estate's claim for payment of $2,000,000 of UM benefits under the Executive Umbrella policy, Mrs. Wadzinski, individually and as the representative of Mr. Wadzinski's estate, brought suit against Auto-Owners.

¶ 7. The provision in the Executive Umbrella policy at the center of the parties' dispute is an endorsement captioned "Exclusion of Personal Injury to Insureds Following Form." That endorsement provides as follows: "We do not cover personal injury to you or a relative. We will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A." The policies listed in Schedule A were issued by Auto-Owners.

¶ 8. The parties brought competing motions for summary judgment on the issue of UM coverage under the Executive Umbrella policy. Auto-Owners asserted that the Executive Umbrella policy "clearly and unambiguously excludes an additional claim for UM coverage." Wadzinski argued that the Executive Umbrella policy, when read as a whole, is ambiguous and that a reasonable insured would expect $2,000,000 in UM coverage under the policy. After briefing and argument, the Brown County Circuit Court granted summary judgment in favor of Auto-Owners. The court concluded that it was "[o]bviously[,] blatantly, unambiguously clear" that the Executive Umbrella policy provided only third-party liability coverage and no first-party coverage. Wadzinski appealed.

¶ 9. The court of appeals reversed the circuit court's grant of summary judgment. *Wadzinski v. Auto-Owners Ins. Co.,* 2011 WI App 47, ¶ 1, 332 Wis. 2d 379,

797 N.W.2d 910. The court of appeals concluded that the Executive Umbrella policy was contextually ambiguous, and therefore, an insured reading the policy and endorsements could reasonably expect the policy to afford $2,000,000 of first-party UM coverage. Auto-Owners petitioned this court for review, which we granted.

## II.  DISCUSSION

### A.  Standard of Review

¶ 10.   The circuit court interpreted the insurance contract and granted Auto-Owners' motion for summary judgment on the question of whether the Executive Umbrella policy affords coverage for losses caused by uninsured motorists. Insurance contract interpretation is a question of law that we review independently of decisions of the circuit court and court of appeals, while benefitting from their analyses. *Acuity v. Bagadia,* 2008 WI 62, ¶ 12, 310 Wis. 2d 197, 750 N.W.2d 817. Whether an insurance contract is ambiguous is also a question of law for our independent determination. *Id.,* ¶ 13. When reviewing summary judgment, we apply the same methodology as the circuit court to determine whether, under Wis. Stat. § 802.08(2) (2009–10),[6] the moving party is entitled to judgment as a matter of law. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

### B.  Insurance Policy Interpretation

¶ 11.   An insurance policy is a contract, and a court's primary purpose in interpreting a contract for

---

[6] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

insurance is to give effect to the intentions of the parties. *Folkman v. Quamme,* 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. The parties' intentions are presumed to be expressed in the language of the policy. *Id.,* ¶¶ 12–13. We construe the policy language from the perspective of a reasonable insured, giving the words used their common and ordinary meaning. *Stubbe v. Guidant Mut. Ins. Co.,* 2002 WI App 203, ¶ 8, 257 Wis. 2d 401, 651 N.W.2d 318. On the other hand, where the policy language at issue "is susceptible to more than one reasonable construction," it is ambiguous. *Id.* Where ambiguity exists in a grant of coverage, we will construe the policy against the drafter, and in favor of the reasonable expectations of the insured. *Folkman,* 264 Wis. 2d 617, ¶¶ 16–17.

■■

¶ 12.    However, the principle that ambiguities will be construed in favor of the insured is not without limits. Primarily, this rule of construction applies to determine the breadth of initial grants of coverage. Accordingly, ambiguities in a grant of coverage are construed broadly in favor of affording coverage. *Acuity,* 310 Wis. 2d 197, ¶ 13. This benefits the insured. Ambiguities in exclusions to a grant of coverage are construed narrowly, thereby limiting the exclusion. *Frost v. Whitbeck,* 2001 WI App 289, ¶ 9, 249 Wis. 2d 206, 638 N.W.2d 325. This also favors the insured. However, a reasonable insured is presumed to understand that an exclusion in an insurance policy limits, rather than confers, coverage. *Bulen v. W. Bend Mut. Ins. Co.,* 125 Wis. 2d 259, 263, 371 N.W.2d 392 (Ct. App. 1985). Stated otherwise, clauses of exclusion subtract from coverage, rather than add to coverage. *Id.*

¶ 13. Further, where an insurance policy's initial grant of a type of coverage is clear, a court will not interpret an ambiguity in an exception to an exclusion to operate as a grant of an additional type of coverage. *See Jaderborg v. Am. Family Mut. Ins. Co.*, 2000 WI App 246, ¶ 17, 239 Wis. 2d 533, 620 N.W.2d 468 ("Coverage cannot be established by an exception to an exclusion.") (citing Arnold P. Anderson, *Wisconsin Insurance Law* § 1.9B (4th ed. 1998)). An exclusion must be read in conjunction with the policy's initial grant of coverage because it is on that initial grant of coverage that the exclusion operates. An " 'exception to an exclusion [from coverage] does not, standing alone, create coverage unless the claim is cognizable under the general grant of coverage.' " *Jaderborg*, 239 Wis. 2d 533, ¶ 17 (citation omitted).

¶ 14. These principles simply reflect the traditional three-part inquiry into questions of insurance coverage. When determining whether a policy provides coverage, a court first looks to the initial grant of coverage. *See Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, ¶ 22, 311 Wis. 2d 548, 751 N.W.2d 845. "If the court determines that the policy was not intended to cover the claims asserted, the inquiry ends." *Id.* If the court determines that the initial grant of coverage does cover the type of claim presented, the second step requires the court to examine the policy's exclusions to determine whether coverage has been withdrawn by an exclusion. *See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65. Third, if coverage for the claim has been withdrawn by an exclusion, the court examines any exceptions to that exclusion that might reinstate coverage for the claim. *See id.*

¶ 15.  Two aspects of this established inquiry are particularly relevant here. First, a policy's initial grant of coverage is a separate analysis that precedes examination of a policy exclusion and exceptions to the exclusion.[7] Second, when we examine exclusions and their exceptions, we do so with a slightly modified focus because the analysis of whether an exclusion or an exception applies presumes that the claim comes within the initial grant of coverage. Under this method of inquiry, exclusions are construed narrowly. Additionally, an exception to an exclusion cannot create coverage where the policy's initial grant of coverage does not provide that type of coverage. *See id.*

¶ 16.  Furthermore, although we will resolve coverage and exclusion ambiguities in favor of an insured's reasonable expectations, this interpretive method does not require us to "simply adhere to any interpretation that is grammatically plausible and creates coverage for insureds." *State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 47, 275 Wis. 2d 35, 683 N.W.2d 75. A term that is potentially ambiguous when read in isolation may be clarified by reference to the policy as a whole, and we will, therefore, examine the effect of individual terms within the context of the entire policy when resolving claimed ambiguities. *See Blum v. 1st Auto & Cas. Ins. Co.,* 2010 WI 78, ¶ 20, 326 Wis. 2d 729, 786 N.W.2d 78.

---

[7] This corresponds to the logical and objectively reasonable inquiry in which an insured will engage when examining his or her policy:  Is there coverage under this policy? Is coverage somehow excluded? Are there any exceptions to that exclusion that might reinstate coverage?

¶ 17.   In addition to the language used in the policy, we will look to the purpose of the particular insurance and the kind of coverage that a reasonable person in the insured's position would expect under the policy.[8] *See id.,* ¶¶ 23–28. Accordingly, where one potential interpretation of an allegedly ambiguous term or phrase would contravene the purpose of the insuring agreement or would expand coverage beyond the kind of coverage contemplated in the policy, such interpretation will be rejected as unreasonable. *See id.,* ¶¶ 31–32.

¶ 18.   Language in an insurance policy's grant of coverage may be ambiguous such that an insured may reasonably expect the terms to mean that coverage is provided for the claim, or that an exclusion from coverage is inapplicable. *See Vandenberg v. Cont'l Ins. Co.,* 2001 WI 85, ¶ 40, 244 Wis. 2d 802, 628 N.W.2d 876. Alternatively, language that is seemingly clear may be made ambiguous in the context of the policy as a whole. *Folkman,* 264 Wis. 2d 617, ¶ 19. This "contextual ambiguity" arises when a policy provision that may at first seem unambiguous becomes susceptible to more than one reasonable meaning when read in the context of other policy language. *Id.,* ¶ 21. Asserted contextual

[8] Although the factor of policy cost will not be dispositive in ascertaining the parties' intentions, the amount paid for coverage may lend support to the conclusion that potentially ambiguous terms should be construed one way rather than another. *Cf. Gen. Star Indem. Co. v. Bankr. Estate of Lake Geneva Sugar Shack, Inc.,* 215 Wis. 2d 104, 120–21, 572 N.W.2d 881 (Ct. App. 1997) (relatively low premium for insurance policy buttressed conclusion that parties did not contemplate policy to cover more substantial risks).

ambiguities also may be disproved by examination of the policy as a whole. *See Blum,* 326 Wis. 2d 729, ¶ 32.

¶ 19. For example, under the "Coverages" section of the Executive Umbrella policy, only one type of coverage is afforded: third-party liability. The policy states that Auto-Owners "will pay on behalf of the insured the ultimate net loss in excess of the retained limit which the insured becomes legally obligated to pay as damages because of personal injury or property damage."[9]

■■■

¶ 20. UM coverage is first-party coverage; it is a different type of coverage than third-party liability coverage.[10] First-party coverage does not come within the policy's statement that it will pay that "which the insured becomes legally obligated to pay as damages," because the phrase describes only third-party liability coverage. Furthermore, first-party coverage requires a specific grant of that type of coverage in order to add to the third-party liability coverage initially granted. *See Muehlenbein v. W. Bend Mut. Ins. Co.,* 175 Wis. 2d 259, 266–67, 499 N.W.2d 233 (Ct. App. 1993) (concluding

---

[9] As applicable here, the definition of "retained limit" provides that Auto-Owners' liability under the Executive Umbrella does not arise until "the limits of liability . . . for each policy listed or insurance described in Schedule A" are exceeded. Again, this is an affirmation of third-party liability coverage.

[10] As early as 1987, the Wisconsin Insurance Commissioner exempted umbrella policies from the statutory requirement that all automobile liability policies afford UM coverage. *See* Wis. Admin. Code § INS 6.77(4)(a) (Jan. 2012); *see also* Wis. Stat. § 632.32(1) and (4)(a)1. (2005–06) (requiring that all auto policies include UM coverage, "[e]xcept as otherwise provided," Wis. Stat. § 632.32(1) (2005–06)). Wadzinski does not assert here that UM coverage was required in umbrella policies at the time of the accident, and we therefore do not address the issue further.

that a court first considers the type of coverage afforded). Auto-Owners' grant of coverage unambiguously, and exclusively, provides third-party coverage.[11]

¶ 21. The question then becomes whether the endorsement that contains an exception to an exclusion of first-party coverage provides a grant of an additional type of coverage, i.e., first-party coverage. As we have explained above, the initial grant of coverage in the Executive Umbrella policy is for third-party liability coverage; on that point, there is no dispute between the parties.[12] If the policy did not include an endorsement captioned "Exclusion of Personal Injury to Insureds Following Form" and its exception to that exclusion, there would be no argument made that the policy affords more than third-party liability coverage.

---

[11] The Executive Umbrella policy's "Insuring Agreement" provides general guidance in interpreting the policy. It states:

> We agree to provide insurance subject to all the terms of this policy. In return, you must pay the premium and comply with all the policy terms.
>
> This policy applies to personal injury and property damage which occur during the policy period as shown in the Declarations. The limits of our liability and the premium are also shown in the Declarations.

Accordingly, the Insuring Agreement's references to the relevant policy provisions affirm that the policy provides coverage for injuries or property damage suffered by third-parties, not injuries or property damage suffered by the insured.

[12] The policy's grant of coverage states that Auto-Owners "will pay on behalf of the insured the ultimate net loss in excess of the retained limit which the insured becomes legally obligated to pay as damages because of personal injury or property damage." This is an unambiguous statement of third-party liability coverage.

¶ 22. Accordingly, we begin by examining the words used in the endorsement's exclusion and the exclusion's exception. We do so in the context of the policy in which they appear:

## EXCLUSION OF PERSONAL INJURY TO INSUREDS FOLLOWING FORM

*We* do not cover personal injury to you or a relative. *We* will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A.

(Emphasis added.)

¶ 23. The caption to the endorsement gives notice that what is to follow is an exclusion from coverage for the insured's first-party personal injury claims.[13] However, interpretation of an insurance policy cannot rest on a caption alone; the entire policy provision must be considered. *See Ott v. All-Star Ins. Corp.,* 99 Wis. 2d 635, 645, 299 N.W.2d 839 (1981).

¶ 24. The statements in the endorsement about what "*we* do not cover" or what "*we* will cover" are statements of Auto-Owners' obligations under the Executive Umbrella policy and Auto-Owners' obligations under the additional policies listed in Schedule A. Stated otherwise, the "Comprehensive Personal Liabil-

---

[13] Including an endorsement to clarify the limited scope of coverage is a valid and permissible use of an endorsement. *Muehlenbein v. W. Bend Mut. Ins. Co.,* 175 Wis. 2d 259, 268–69, 499 N.W.2d 233 (Ct. App. 1993). A provision that simply reaffirms existing coverage is not rendered meaningless by its repetition; rather, the reiteration serves to strengthen the conclusion that first-party UM coverage was not afforded under the Executive Umbrella policy. *See id.*

ity" policy and the "Automobile Liability" policy, listed in Schedule A of the Executive Umbrella policy, were issued by Auto-Owners. Therefore, no other vendor of insurance has any impact on the interpretation of the endorsement at issue here and no other vendor will make payments under either of the underlying policies described in Schedule A.

¶ 25.  The language of the endorsement is helpful in other ways too. The first sentence of the endorsement provides that, "We do not cover personal injury to you or a relative." The Executive Umbrella policy defines "we": " 'We,' 'us' or 'our' means the Company providing this insurance." A reasonable insured would therefore understand that "we" refers to Auto-Owners. There can be no misunderstanding that first-party coverage is not created by the first sentence of the endorsement.

¶ 26.  The second sentence of the endorsement provides, "We will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A." Again, "We" refers to Auto-Owners. "Such injury" refers back to "personal injury to you or a relative" in the first sentence. By so referring, the phrase assures that the first sentence does not interfere with an independent obligation for first-party coverage that was undertaken in a policy listed in Schedule A and issued by Auto-Owners.[14] The nature of that independent obligation is explained as: "to the extent that

---

[14] Additionally, Wadzinski argues that Wis. Stat. § 632.32(6)(b) prohibits Auto-Owners from disclaiming coverage for its own insured under the Executive Umbrella policy because that statute forbids an insurer from excluding from coverage "[A]ny person who is a named insured." As discussed above, the Insurance Commissioner exempted umbrella policies from the requirement of affording UM coverage, so an umbrella

insurance is provided by an underlying policy listed in Schedule A." Accordingly, any obligation that Auto-Owners has for first-party coverage under a policy that it issued and that is listed in Schedule A will be honored, notwithstanding the lack of first-party coverage in the Executive Umbrella.

¶ 27. It follows then that the statement, "We will cover such injury to the extent that insurance is provided by an underlying policy listed in schedule A," is reasonably interpreted as Auto-Owners' assurance to its insured that even though the Executive Umbrella policy does not provide first-party coverage, that lack of coverage for first-party claims does not interfere with Auto-Owners' agreed–upon coverage for first-party claims when such coverage is afforded by a policy listed in Schedule A of the Executive Umbrella policy. The exception can have no other meaning and remains consistent with the grant of $2,000,000 third-party liability coverage in the Executive Umbrella policy while also maintaining Auto-Owners' obligation in Auto-Owners' Automobile Liability policy listed in Schedule A.

¶ 28. Wadzinski argues that it would be illogical for the Executive Umbrella policy to require the insured to keep the underlying Automobile Liability

policy that does not afford UM coverage will not be in violation of § 632.32(6)(b) because no such coverage need be provided under an umbrella policy.

Moreover, Wis. Stat. § 632.32(6)(b)'s prohibition against excluding named insureds from coverage further supports our reading of the endorsement as merely reaffirming Auto-Owners' obligation to maintain UM coverage *in its underlying policy*. Without the second sentence of the endorsement, the policy might be interpreted as running afoul of § 632.32(6)(b)'s prohibition; that sentence, however, clarifies that Auto-Owners honors its obligations in the underlying policy and under the statute.

331

policy "in full effect" unless the full panoply of coverage under the Commercial Auto policy, including UM coverage, were afforded under the Executive Umbrella policy. In particular, Wadzinski relies on the endorsement caption's use of the phrase "following form" to suggest that the endorsement could reasonably be interpreted as incorporating the UM coverage from the Commercial Auto policy.[15] Therefore, we examine the meaning of "following form" and its use in the Executive Umbrella policy.

¶ 29.   "Following form" is an insurance industry term of art that is typically understood by insurance professionals to suggest that an excess or umbrella policy incorporates the terms of another underlying policy. *See* 23 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 145.1 (2d ed. interim vol. 2003) [hereinafter *Holmes' Appleman* § 145.1]. Following form policies are typically very short, in that they simply state their adoption of underlying policy terms, usually without much else. *See Johnson Controls, Inc. v. London Mkt.,* 2010 WI 52, ¶ 34 & n.7, 325 Wis. 2d 176, 784 N.W.2d 579, *reconsid. denied,* 2011 WI 1, 330 Wis. 2d 443, 793 N.W.2d 71 (citing *Holmes' Appleman* § 145.1). This practice is intended to ensure that the same terms of coverage are maintained between primary and excess

---

[15] Wadzinski points to numerous other provisions in the body of the Executive Umbrella policy as supporting the argument that the policy and endorsement are contextually ambiguous and that first-party coverage should, therefore, be afforded. As discussed above, we conclude that the provisions in the unendorsed body of the policy clearly and exclusively provide third-party coverage. We focus, therefore, on the Personal Injury endorsement as the only provision that could potentially upset the contextually clear grant of third-party coverage in the Executive Umbrella policy.

levels of insurance. *See* 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 220:32 n.31 (3d ed. 2005 & Supp. 2011). Nonetheless, following form policies regularly include terms and provisions that afford distinct coverage or exclusions from those provided in the underlying policy. *See Holmes' Appleman* § 145.1.

¶ 30.  A "stand-alone" policy may be contrasted with a "following form" policy. "A stand-alone excess policy is an independent insuring agreement." *Id.* Accordingly, the terms "stand-alone" and "following form" refer to the type of insuring agreement as a whole, rather than to a method of defining terms within the policy. *See id.* Here, there is no question that the Executive Umbrella policy is a stand-alone policy, not a following form policy. However, Wadzinski argues that the endorsement is a following form endorsement. This makes little sense, as the term is one that is applied to policies as a whole, not to endorsements to a stand-alone policy.

¶ 31.  Furthermore, the use of "following form" in the caption to the endorsement does not create a contextual ambiguity. First, as we have noted, without the contested endorsement, only third-party coverage is afforded in the Executive Umbrella policy. Second, the exclusionary language of the Personal Injury endorsement reaffirms the Executive Umbrella's limited third-party liability coverage, rather than granting a new type of coverage. *See Muehlenbein,* 175 Wis. 2d at 269.

¶ 32.  Wadzinski also points to the "Maintenance of Underlying Insurance" provision in the Executive Umbrella policy as support for the argument that "following form" is intended to incorporate such underlying coverage wholesale. This argument misperceives the nature of umbrella coverage and ignores the plain

333

meaning of the "Maintenance of Underlying Insurance" provision in the Executive Umbrella policy.

¶ 33. The "Maintenance of Underlying Insurance" provision instructs the insured that "You must keep each policy described in Schedule A in full effect during the term of this policy. . . . If you fail to do so, we shall be liable only to the extent we would have been liable had you complied." The provision did not require that Wadzinski maintain any amount of UM coverage in the Executive Umbrella policy. Rather, the provision requires that an insured maintain the type of coverage actually contemplated under the umbrella, i.e., third-party liability coverage, not necessarily all conceivable types of coverage.

¶ 34. The argument that the underlying insurance provision mandates UM benefits also is circular. It assumes that the extent to which Auto-Owners "would have been liable" already includes coverage for UM benefits. For example, if Wadzinski had decreased the UM coverage under the Commercial Auto policy, but maintained the separate $1,000,000 in comprehensive liability coverage under the Commercial Auto policy, it seems that the "Maintenance of Underlying Insurance" provision would have been complied with as to the third-party coverage under the Executive Umbrella policy. *See Etter v. State Farm Mut. Auto. Ins. Co.,* 2008 WI App 168, ¶¶ 13–15, 314 Wis. 2d 678, 761 N.W.2d 26 (concluding that the requirement that underlying liability insurance be maintained did not require insured to maintain UM coverage where the umbrella policy did not otherwise contemplate UM coverage). Accordingly, we cannot conclude that the requirement of underlying insurance contributes to any contextual ambiguity in regard to first-party coverage.

¶ 35.   Accordingly, although the meaning of the term "following form" has been artfully argued by Wadzinski, such argument does not have sufficient force to contravene the plain language that specifies the type of coverage afforded under the endorsed Executive Umbrella policy. *See Holmes' Appleman* § 145.1.

¶ 36.   Wadzinski also relies on *Stubbe,* wherein the court of appeals concluded that the umbrella policy at issue did afford first-party UIM coverage. The court of appeals reasoned that because the umbrella policy made multiple explicit references to the underlying UIM coverage, including showing that it was a covered provision on the declarations page, the policy was ambiguous as to the initial grant of coverage. *Stubbe,* 257 Wis. 2d 401, ¶¶ 10–12. That ambiguity caused the court to conclude that the insured was entitled to coverage. *Id.,* ¶ 15. The Executive Umbrella policy, however, makes no references to UM coverage. There-fore, *Stubbe* provides no support for the position Wadzinski takes, given the terms of the Executive Umbrella policy that we are called upon to interpret.

¶ 37.   Our interpretation of the Executive Um-brella policy rests on established analyses for determin-ing whether an insurance policy is contextually ambigu-ous. *See Folkman,* 264 Wis. 2d 617, ¶ 29. In *Folkman,* we stated that "any contextual ambiguity in an insur-ance policy must be genuine and apparent on the face of the policy, if it is to upset the intentions of an insurer embodied in otherwise clear language." *Id.* Accordingly, an insurance policy will not be deemed contextually ambiguous "simply because the insured has offered a remotely possible second interpretation." *Id.,* ¶ 31 (quoting *Hause v. Bresina,* 2002 WI App 188, ¶ 8, 256

Wis. 2d 664, 649 N.W.2d 736 (internal quotation and citation omitted).[16] We hold to these principles here.

¶ 38. Our construction of the Executive Umbrella policy and its endorsement also is supported by interpretations of similar insurance provisions in multiple cases before the court of appeals. Collectively, these cases provide that an unambiguous initial grant of third-party coverage will not be undone by an exclusion, *see Jaderborg,* 239 Wis. 2d 533, ¶ 17; that an endorsement that includes both an exclusion and an exception to the exclusion will not be read to overcome the initial grant of coverage, *see Muehlenbein,* 175 Wis. 2d at 265–66; and that the requirement of maintaining underlying automobile liability insurance does not translate into a corresponding requirement that UM coverage be maintained, *see Etter,* 314 Wis. 2d 678, ¶¶ 13–15.

¶ 39. In accordance with these principles, we conclude that the Executive Umbrella policy's grant of coverage provides only one type of coverage: excess third-party liability coverage. Read in context, neither the exclusion of first-party coverage nor its exception that reaffirms Auto-Owners' underlying obligations can be read to rewrite the umbrella policy's unambiguous grant of third-party coverage. Accordingly, we conclude that Wadzinski's Executive Umbrella policy cannot reasonably be construed to afford $2,000,000 of UM coverage.

---

[16] In its opening brief to this court, counsel for Wadzinski stated that "Ambiguous policies always create coverage," citing *Kaun v. Indus. Fire & Cas. Ins. Co.,* 148 Wis. 2d 662, 669, 436 N.W.2d 321 (1989). While the cited case spoke broadly of the rule of construing ambiguous insurance policies in favor of coverage, the proposition counsel has stated is not a correct statement of the law, as we have explained above.

## III.   CONCLUSION

¶ 40.   We conclude that the Executive Umbrella policy at issue does not afford first-party UM coverage. The policy's grant of coverage unambiguously provides only excess third-party liability coverage. Further, the language and structure of the endorsement to the Executive Umbrella policy demonstrate that the endorsement reaffirms the umbrella policy's exclusion of first-party coverage. Additionally, an exception to that exclusion clarifies that the exclusion is not intended to interfere with first-party coverage in other Auto-Owners policies that are referred to in Schedule A. Accordingly, we conclude that the circuit court's summary judgment in favor of Auto-Owners was proper, and therefore, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 41. ANN WALSH BRADLEY, J.     (*dissenting*). The issue in this case is whether the umbrella insurance policy provides uninsured motorist (UM) coverage. The parties' arguments center on the meaning of an endorsement, which provides in full:

Exclusion of Personal Injury
to Insureds Following Form

We do not cover personal injury to you or a relative. We will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A.

¶ 42.   Both parties agree that the first sentence, standing alone, would operate to exclude UM coverage.[1] However, the first sentence does not stand alone, and

---

[1] The parties appear to agree that the endorsement's reference to "personal injury to you or a relative" relates to first-party UM coverage. No argument has been made that the

the parties disagree about the meaning of the second sentence, "We will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A." It is undisputed that UM insurance is provided by one of the underlying policies listed in Schedule A.

¶ 43.  In arriving at its conclusion that there is no coverage here, the majority invents a novel approach to the interpretation of insurance policies, generally. Its approach is erroneous because it: (1) evinces a misunderstanding of how policies are written; (2) is inconsistent with how courts heretofore have approached the interpretation of policies; and (3) is based on a nonsensical premise that an endorsement in an umbrella policy could ever negate coverage in an underlying policy.

¶ 44.  I conclude that, at the very least, the policy is contextually ambiguous and should be construed in favor of coverage. Accordingly, I respectfully dissent.

I

¶ 45.  The majority correctly asserts that a court begins its interpretation of an insurance policy by looking to the grant of coverage. Majority op., ¶ 14. However, it appears to believe that the only place a grant of coverage can be made is in the section of the policy labeled "Coverages." *Id.*, ¶¶ 19–20. The majority reads the "Coverages" section of the umbrella policy in isolation, and it determines that this policy unambiguously provides only third-party coverage. *Id.*, ¶¶ 19–20. Based on this premise, the majority asserts that the endorsement at issue is an "exclusion" rather than a grant of coverage. *Id.*, ¶ 21.

endorsement is instead intended to address an insured's third-party liability for injury caused to another insured.

¶ 46. Without specifically mentioning or discussing Wadzinski's interpretation, the majority further contends that there can be only one reasonable interpretation of the second sentence of the endorsement. It concludes that the phrase "we will cover" refers not only to Auto-Owners' obligations under the umbrella policy, but also its obligations under the underlying policies. *Id.,* ¶ 24. It asserts that the second sentence is meant to clarify that the first sentence does not negate any coverage provided by an underlying policy. *Id.,* ¶¶ 26–27.

## II

¶ 47. The majority's approach evinces a misunderstanding of how insurance policies are written. "An endorsement is a written document attached to an insurance policy that *modifies the policy by changing the coverage provided by the policy.*" 1 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition* § 1.07[8] (2009) (emphasis added). Often, endorsements are used by an insurer to tailor a standard policy to the needs of a particular insured or the regulatory requirements of a particular state. *Id.*

¶ 48. Although the majority focuses exclusively on the "Coverages" section to define the grant of coverage, a grant of coverage may also be found in an endorsement. Just as much as an endorsement may "limit or subtract coverage," an endorsement may also "add coverage for acts or things not covered by the original policy." *Id.* Accordingly, endorsements can significantly alter the scope of coverage.[2]

---

[2] *See Muehlenbein v. West Bend Mut. Ins. Co.,* 175 Wis. 2d 259, 265, 499 N.W.2d 233 (Ct. App. 1993) ("An endorsement is a provision added to an insurance contract altering its scope or

¶ 49.   Given that endorsements can alter the scope of coverage, one leading treatise recommends reading a policy by starting with the endorsements:

> Because endorsements change the basic policy form, reading a Commercial General Liability ("CGL") policy, or any insurance policy, is unlike reading anything else. Put simply, the reader should not start from page one. . . . It is necessary to begin with the endorsements because they can change any part or provision of an insurance policy, no matter how fundamental to the policy.

3 Thomas, *supra,* § 21.01[1]. The majority errs by failing to consider that a grant of coverage may be found in an endorsement.

## III

¶ 50.   Not only does the majority's approach evince a misunderstanding of how policies are written, its approach is also inconsistent with the way in which insurance policies are interpreted by courts. To determine what is covered under a policy and whether a policy provision is ambiguous, courts read individual provisions in the context of the whole policy, rather than isolating a small part of the policy language. *Folkman v. Quamme,* 2003 WI 116, ¶ 21, 264 Wis. 2d 617, 665 N.W.2d 857; *State Farm Mut. Auto. Ins. Co. v. Bailey,* 2007 WI 90, ¶ 27, 302 Wis. 2d 409, 734 N.W.2d 386.

¶ 51.   The approach adopted by the majority was explicitly rejected by the court of appeals in *Stubbe v. Guidant Mutual Insurance Co.,* 2002 WI App 203, 257

application that takes precedence over printed portions of the policy in conflict therewith."); *Stubbe v. Guidant Mut. Ins. Co.,* 2002 WI App 203, ¶ 13, 257 Wis. 2d 401, 651 N.W.2d 318 (same).

Wis. 2d 401, 651 N.W.2d 318. In that case, an umbrella policy's statement of coverage was similar to the "Coverages" section here in that it exclusively granted third-party liability coverage.[3] The insurer, Guidant, argued that the statement of coverage was unambiguous, and therefore, that the policy did not provide any first-party coverage.

¶ 52.   The *Stubbe* court noted that "the policy must be read as a whole," *id.*, ¶ 10, and it rejected Guidant's "view of the umbrella policy [which] focuse[d] almost exclusively on the policy's statement of coverage," *id.*, ¶ 9. Rather, because of the interaction between an exclusion, an endorsement, and the schedule of underlying insurance limits, the court of appeals found the umbrella policy to be contextually ambiguous, and it construed it in favor of coverage. *Id.*, ¶ 15 n.4.

¶ 53.   The majority should not tinker with established methods of interpretation. This case and *Stubbe* are on all fours. In both cases, the statement of coverage does not include first-party claims. In both cases, other provisions of the policy, including the endorsements, can be read to grant UM coverage. The majority should follow *Stubbe*'s analysis, rather than overruling *Stubbe* sub silencio.[4]

---

[3] In relevant part, the statement of coverage provided: "We will pay the ultimate net loss that any covered person becomes legally obligated to pay because of personal injury or property damage to which the insurance applies occurring during the policy period." *Stubbe,* 257 Wis. 2d 401, ¶ 9.

[4] The majority's discussion evinces a number of additional misunderstandings about how insurance policies are interpreted which are not specifically addressed in this dissent. For instance, it asserts that the rule of construing ambiguities in favor of coverage applies "primarily" when determining the

IV

¶ 54.  Because it isolates the "Coverages" section to determine the scope of the grant of coverage, the majority presumes without analysis that the endorsement at issue in this case must be an exclusion. It then jumps to the conclusion that the second sentence of the endorsement must be an exception to the exclusion, and it adopts a strained interpretation of the endorsement based on a nonsensical premise.

¶ 55.  The majority interprets the first sentence, "we do not cover personal injury to you or a relative," to mean that there is no UM coverage. Majority op., ¶ 25. It advances that the role of the second sentence, "[w]e will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A," is to clarify that this fact will not negate any UM coverage provided by Auto-Owners in an underlying policy. *Id.,* ¶¶ 26–27. It contends that the second sentence of the endorsement "assures [Wadzinski] that the first sentence does not interfere with an independent

breadth of the grant of coverage. Majority op., ¶ 12. Yet, in the very same paragraph, it acknowledges that exclusions are construed narrowly. The consequence of construing an exclusion narrowly is that the policy is construed in favor of coverage.

Additionally, the majority sets forth a number of related, overbroad "principles" that likewise do not comport with the way in which courts interpret insurance policies. For example, at ¶ 38, it states: "an unambiguous initial grant of third-party coverage will not be undone by an exclusion, . . . an endorsement that includes both an exclusion and an exception to the exclusion will not be read to overcome the initial grant of coverage, . . . and that the requirement of maintaining underlying automobile liability insurance does not translate into a corresponding requirement that UM coverage be maintained." A court's interpretation of an insurance policy is not dependent on rigid rules. Rather, it depends upon the language of the policy.

342

obligation for first-party coverage that was undertaken [by Auto-Owners] in [an underlying] policy listed in Schedule A[.]" *Id.,* ¶ 26.

¶ 56.   The premise that a provision in an umbrella policy can interfere with or negate coverage provided in an underlying policy is nonsensical. As the court of appeals said, "we question why an insurer or anyone else would believe that an exclusion in an umbrella policy could have any effect on coverage in an underlying policy." *Wadzinski v. Auto-Owners Ins. Co.,* 2011 WI App 47, ¶ 16, 332 Wis. 2d 379, 797 N.W.2d 910. An insured purchases an umbrella policy to receive additional protection. The majority's interpretation rests on the false premise that there is a danger of paying an additional premium but receiving less coverage. Any insurance customer would be surprised to learn that the coverage it purchased in an underlying policy could be wiped away by the insured's purchase of an umbrella policy.

¶ 57.   Further, the majority's construction relies on an unreasonable interpretation of the phrase "we will cover such injury." The policy defines "we" as "the company providing *this* insurance." (Emphasis added.) It is unreasonable to interpret the phrase "we will cover such injury" as a reference to Auto-Owners' promise to cover a risk under a different policy.

¶ 58.   The problem with the majority's interpretation of that phrase is illustrated by imagining a different scenario. Here, it happens to be Auto-Owners that provided both the umbrella policy and the underlying policy. "Generally, however, excess insurance is purchased from an insurer different from that providing the underlying insurance." Michael A. Knoerzer, Practicing Law Institute, *Introduction to Excess Insurance,* 629 PLI/Lit 181, 187 (2000). If the underlying insurance were provided by XYZ Mutual instead of Auto-

Owners, the majority's interpretation would render the second sentence of the endorsement meaningless.

V

¶ 59. In contrast to the majority's strained interpretation, I conclude that, at the very least, the policy is contextually ambiguous and thus should be construed in favor of providing coverage. As stated above, the text of the endorsement provides: "We do not cover personal injury to you or a relative. We will cover such injury to the extent that insurance is provided by an underlying policy listed in Schedule A." This text is preceded by a caption that reads: "Exclusion of Personal Injury to Insureds Following Form."

¶ 60. Wadzinski argues that the endorsement means that personal injury for an insured will be excluded if and only if it is not covered by an underlying policy issued in Schedule A. If it is covered by an underlying policy, Wadzinski asserts, then the umbrella policy will "follow form" and cover it as well.

¶ 61. This interpretation comports with the text of the endorsement. The phrase "we will cover such injury" appears to be a grant of coverage under this policy, and the phrase "to the extent that coverage is provided by an underlying policy listed in Schedule A" can reasonably be interpreted to mean if and only if coverage is provided by an underlying policy listed in Schedule A.

¶ 62. Further, Wadzinski's interpretation is consistent with the use of the term "following form" in the caption. In the insurance industry, that term means that an excess policy will incorporate terms in an underlying policy to provide coextensive coverage. *See Johnson Controls, Inc. v. London Mkt.,* 2010 WI 52, ¶ 34, 325 Wis. 2d 176, 784 N.W.2d 579. Auto-Owners chose to use

344

the term "following form" in the caption of this endorsement, and it must be given some meaning.[5]

¶ 63.   The majority dismisses Wadzinski's interpretation of the term "following form" without providing any alternative explanation for Auto-Owners' decision to use that term. The majority declines to give the caption any meaning because it asserts that the term "following form" can only be used when an excess policy follows the entire form of an underlying policy. According to the majority, there can be no such thing as a following form endorsement. Majority op., ¶ 30. Why not?

¶ 64.   It may be that many excess insurers choose to follow the form of an entire policy. However, other excess insurers have written policies that are largely independent of the underlying policies, but that never-

---

[5] It should be noted that the phrase "following form" appears in four of the 11 endorsements to Auto-Owners' umbrella policy, including the "Punitive Damages – Following Form Endorsement," the Bodily Injury Following Form Endorsement," the endorsement regarding Pollution Liability (Following Form)," and the endorsement at issue here. The surrounding endorsements follow a similar pattern as the endorsement at issue in this case. It appears that when Auto-Owners issued the policy and the endorsement, it believed that the term had meaning.

Additionally, some of these parallel endorsements expressly acknowledge that coverage will be provided under this umbrella policy to the extent that coverage is provided by the underlying policy. The punitive damages endorsement, for example, provides "It is agreed that *this policy* covers punitive or exemplary damages *only to the extent that such coverage is available to the insured under a policy listed in the Schedule of Underlying Insurance Policies.*" (Emphasis added.) Similarly, the pollution endorsement provides: "*This policy* does not apply to [damages caused by pollution] except to the extent that coverage is provided[] a. by a policy described in SCHEDULE A . . . ." (Emphasis added.)

theless offer a certain type of coverage or exclusion that follows the form of a coverage or exclusion in an underlying policy. Nothing prevents an umbrella insurer from writing such an endorsement, as it appears Auto-Owners has done here.[6]

¶ 65. Wadzinski's interpretation is consistent with the text and gives meaning to all the language in the caption. UM coverage is "excluded" unless it is covered by an underlying policy, in which case the umbrella phrase will "follow form" and also provide coverage.

¶ 66. A policy's grant of coverage is ambiguous if it is susceptible to more than one reasonable interpretation. *Folkman,* 264 Wis. 2d 617, ¶ 13; *Stubbe,* 257 Wis. 2d 401, ¶ 8. Even if the majority's interpretation can be considered to be reasonable, the policy is rendered ambiguous due to the existence of an alternative reasonable interpretation. Under our well-established

---

[6] In fact, a review of the case law shows that it is common practice to include following form endorsements in a policy that otherwise contains independent terms. The court of appeals recently interpreted an "UNINSURED AND UNDERINSURED MOTORISTS COVERAGE FOLLOWING FORM ENDORSE- MENT" in what otherwise appears to have been a stand-alone personal liability umbrella policy. *Veto v. Am. Fam. Mut. Ins. Co.,* 2012 WI App 56, ¶ 8 n.2, 341 Wis. 2d 390, 815 N.W.2d 713. Further, the Fifth Circuit Court of Appeals recently interpreted an umbrella policy in which only one endorsement, the Professional Liability Limitation endorsement, followed form. *See Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co., Inc.,* 647 F.3d 524, 530 (5th Cir. 2011) ("[N]othing in the Royal policy suggests that it follows form as to all terms and conditions in the Lexington policy. Rather, the Professional Liability Limitation endorsement is the only term that contains a follow form provision, and it specifies that the Royal policy will follow form to the Lexington policy 'with respect to professional liability' arising out of Mariner's operations at the Indianola nursing home.").

canons of construction, an ambiguous policy should be construed in favor of coverage. *Folkman,* 264 Wis. 2d 617, ¶ 13; *Stubbe,* 257 Wis. 2d 401, ¶ 8.

## VI

¶ 67.   Before concluding, I pause to observe that the majority's attempt to bolster its analysis by comparing the cost of various policy premiums is folly. *See* majority op., ¶¶ 4, 5, 17 n.8. It is based on uninformed speculation.

¶ 68.   There is nothing in this record that informs how Wadzinski's premium was determined and nothing in this record which provides any context from which reasonable inferences can be drawn. Nevertheless, the majority asserts in a footnote that "the amount paid for coverage may lend support to the conclusion that potentially ambiguous terms should be construed one way rather than another." *Id.,* ¶ 17 n.8.

¶ 69.   The majority fails to appreciate that the amount paid for excess insurance generally bears little relationship to the range of prices that we have come to expect for primary insurance coverage. "Because excess policies do not provide 'first dollar' coverage and are generally not within the 'working layer,' the premium charged is generally much lower than that of a primary policy." Knoerzer, *supra,* at 187.[7]

---

[7] By way of example, for companies underwriting excess policies for wealthy clients, the first $1 million in coverage is usually the most expensive, at perhaps $150 to $300, with each additional $1 million in coverage costing around $100 to $125 annually. Joseph B. Treaster, *Umbrella Coverage for Preventing Your Ruin,* N.Y. Times, March 18, 2008. The situation is often the reverse for the insurer who underwrites excess policies for middle and lower income clients. *Id.*

¶ 70. It should not surprise any reader of this opinion that no member of this court understands the formulas for determining insurance premiums. Without anything in the record to explain how rates are calculated or what inference should be drawn from the calculation made by the underwriters issuing this policy, any snap judgment based on the amount of a premium would be pure speculation.

¶ 71. Actuaries set the amount of a premium by relying on complex formulas which contain a multitude of variables. I need do nothing more than replicate what the industry considers to be the most basic of formulas to demonstrate this point:

### SIMPLE EXAMPLE

The following simple example illustrates how expenses and profit are incorporated within the fundamental insurance equation and in the ratemaking process . . .

If the rates are appropriate, the premium collected will be equivalent to the sum of the expected losses, LAE, underwriting (UW) expenses (both fixed and variable), and the target underwriting profit. . . . [T]his can be written as:

$$P = L + E_L + (E_F + V \times P) + Q_T \times P$$

$$P - (V + Q_T) \times P = L + E_L + E_F$$

$$P = \frac{[L + E_L + E_F]}{[1.0 - V - Q_T]}$$

$$\bar{P} = [L + E_L + E_F] / X = \frac{[\bar{L} + \bar{E}_L + \bar{E}_F]}{[1.0 - V - Q_T] [1.0 - V - Q_T]}$$

Geoff Werner & Claudine Modlin, Casualty Actuarial Society, *Basic Ratemaking* 125 (4th ed. 2010).

¶ 72.    Given the complexity of ratemaking and the fact that there is nothing in the record to explain the premium and how it was derived, it is difficult to see how the amount of Wadzinski's premium could lend any support to the conclusion that potentially ambiguous terms should be construed one way or another. *See* majority op., ¶ 17 n.8.

¶ 73.    For all of the reasons set forth above, I respectfully dissent.

¶ 74.    I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent.