# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP564 |
| COMPLETE TITLE: | |

Marshall Schinner,
            Plaintiff-Appellant,
        v.
Michael Gundrum,
            Defendant,
West Bend Insurance Company,
            Defendant-Respondent-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 340 Wis. 2d 195, 811 N.W.2d 431
(Ct. App. 2012 – Published)
PDC No: 2012 WI App 31

| | |
|---|---|
| OPINION FILED: | July 12, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 23, 2012 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Washington |
| JUDGE: | James G. Pouros |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | CROOKS, J., concurs. (Opinion filed.) |
| DISSENTED: | BRADLEY, J., ABRAHAMSON, C.J., dissents. (Opinion filed.) CROOKS, J. joins Part II of the dissent. |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Jeffrey Leavell* and *Christopher John Koppes*, and *Jeffrey Leavell, S.C.*, Racine, and oral argument by *Jeffrey Leavell*.


For the plaintiff-appellant, there were briefs by *Keith R. Stachowiak* and *Murphy & Prachthauser, S.C.*, Milwaukee, and *Daniel P. Patrykus* and *Keberle & Patrykus, LLP*, West Bend, and oral argument by *Keith R. Stachowiak*.

An amicus curiae brief was filed by *James A. Friedman* and *Linda S. Schmidt,* and *Godfrey & Kahn, S.C.*, Madison, on behalf of the Wisconsin Insurance Alliance, and oral argument by *Linda S. Schmidt.*

An amicus curiae brief was filed by *Mark L. Thomsen* and *Cannon & Dunphy, S.C.,* Brookfield, on behalf of the Wisconsin Association for Justice.

2013 WI 71

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2011AP564
(L.C. No.  2009CV870)

STATE OF WISCONSIN                :        IN SUPREME COURT

**Marshall Schinner,**

        **Plaintiff-Appellant,**

    **v.**

**Michael Gundrum,**

        **Defendant,**

**West Bend Insurance Company,**

        **Defendant-Respondent-Petitioner.**

**FILED**

**JUL 12, 2013**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals.  *Reversed.*

¶1   DAVID T. PROSSER, J.   This is a review of a published decision of the court of appeals[1] reversing a grant of summary judgment by the Washington County Circuit Court[2] to West Bend

---

[1] Schinner v. Gundrum, 2012 WI App 31, 340 Wis. 2d 195, 811 N.W.2d 431.

[2] Circuit Judge James G. Pouros, presiding.

Mutual Insurance Company (West Bend)[3] against one of its insureds.

¶2 The insured, Michael Gundrum (Gundrum), hosted an underage drinking party. One of Gundrum's many guests, Matthew Cecil (Cecil), assaulted and seriously injured another guest. Gundrum knew that Cecil had a tendency to become belligerent when he was intoxicated but he permitted Cecil to drink anyway. The victim, Marshall Schinner (Schinner), ultimately sued Gundrum and West Bend to secure damages for Schinner's injuries.

¶3 West Bend disputed coverage. The insurer argued that it had no duty to defend and indemnify Gundrum because his actions as a party host were intentional; thus, there was no "accident" and no "occurrence" under the Gundrum family's homeowner's insurance policy. West Bend also contended that even if there were an occurrence under the policy, there was no coverage because of an exclusion in the policy for bodily injury arising out of a non-insured location. The party had been held at a shed at Gundrum Trucking, a family-owned business that was not an insured location under the homeowner's policy.

¶4 The circuit court granted summary judgment to West Bend because it determined that there is no accident when someone intentionally procures alcohol for an underage drinking party, and even if Gundrum's actions were an accident, the victim suffered bodily injury at an uninsured location.

---

[3] The parties, the circuit court, and the court of appeals have referred to the insurance company as "West Bend Insurance Company" and "West Bend Mutual Insurance Company."

¶5    The court of appeals reversed on both issues.  The court of appeals concluded that there was an occurrence because Schinner's assault was an accident when viewed from the standpoint of either the injured person (Schinner) or the insured (Gundrum).  The court of appeals also concluded that the non-insured location exclusion did not apply because Schinner's injury did not arise from some "condition" of that premises.

¶6    The primary question before us is whether Schinner's injury resulted from an occurrence as defined by the West Bend homeowner's insurance policy, thus triggering coverage for Gundrum.  If the answer is yes, we are required to determine whether that coverage was excluded because the injury "arose out of" an uninsured location that was not "used in connection with" an insured premises under the homeowner's policy.

¶7    After carefully considering the facts in the record, the allegations in Schinner's complaint, the pertinent language in the homeowner's insurance policy, and our previous interpretations of "occurrence" in insurance policies, we reverse the court of appeals and reach the following conclusions.

¶8    First, Gundrum's actions in setting up an isolated shed for a drinking party, procuring alcohol and expecting others to bring alcohol, inviting many underage guests to the party, and encouraging the underage guests to drink——especially an underage guest known to become belligerent when intoxicated—— were intentional actions that violated the law.  Gundrum's many intentional wrongful acts were a substantial factor in causing

Schinner's bodily injury.  Viewed from the standpoint of a reasonable insured, Gundrum's intentional actions created a direct risk of harm resulting in bodily injury, notwithstanding his lack of intent that a specific injury occur.  Thus, Schinner's bodily injury was not caused by an "occurrence" within the meaning of the policy, and West Bend is not obligated to provide insurance coverage for Gundrum.

¶9   Second, even assuming there was an occurrence under the West Bend homeowner's policy, coverage is excluded because the injury arose out of the use of an isolated shed for an underage drinking party on uninsured premises.  The fact that the Gundrums kept some personal property insured under the policy at the shed did not make the shed a premises used in connection with the insured's residence, as those terms are defined in the policy.  Thus, the business shed was not an insured location triggering coverage under the homeowner's policy.

## I. FACTUAL BACKGROUND

¶10  The facts of this case are derived from Schinner's Second Amended Complaint against Gundrum and West Bend, witness statements, police reports, Gundrum's deposition, and the West Bend insurance policies of record.

¶11  In December 2008 Gundrum, then 21, resided with his parents, Scott and Teri Gundrum, at their residence on State Highway 144, near Slinger, Wisconsin.  The Gundrums had

purchased a Home and Highway[4] policy (homeowner's policy or the policy) from West Bend covering their residential premises. The homeowner's policy contained personal liability coverage for persons insured under the policy, including Gundrum.

¶12 The personal liability coverage applied to an "occurrence":

A.    Coverage E – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1.    Pay up to our limit of liability for the damages for which an "insured" is legally liable. . . .

2.    Provide a defense at our expense by counsel of our choice . . . .

¶13 The homeowner's policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

¶14 The policy contained an exclusion for bodily injury or property damage liability arising out of a premises that is not an "insured location."[5]

---

[4] The highway, or automobile, portion of the policy is not relevant to this case.

[5] The homeowner's policy stated, "Coverages E and F do not apply to the following: . . . 'Bodily injury' or 'property damage' arising out of a premises: a. Owned by an 'insured'; b. Rented to an 'insured'; or c. Rented to others by an 'insured'; that is not an 'insured location'."

¶15 The homeowner's policy also defined an insured location in part as, "[t]he residence premises," the "part of other premises, other structures and grounds used by you as a residence," and any premises used by the insured "in connection with" the premises described above.

¶16 West Bend had also issued a commercial general liability (CGL) policy to Howard, Jan, Scott, and Guy Gundrum, doing business as HJSG Enterprises, located on Arthur Road near Slinger.  The facilities at this address were commonly referred to as Gundrum Trucking,[6] where the events in question took place. Because of its liquor exclusion clause, HJSG's CGL policy is not at issue in this case.

¶17  On December 14, 2008, Gundrum hosted a party in a shed at Gundrum Trucking.  The party lasted into the early morning

---

The homeowner's policy also contained an exclusion for intentional injury, stating that coverage did not apply to "'[b]odily injury' or 'property damage' which is expected or intended by an 'insured'."

[6] West Bend issued the CGL policy to HJSG Enterprises, but the CGL policy does not refer to Gundrum Trucking.

The record includes a printed copy of the Wisconsin Department of Financial Institutions (DFI) corporate record for Gundrum Trucking, Inc., with its principal office on Arthur Road, Slinger, presumably as proof of how HJSG Enterprises publicly conducted its business, or that HJSG is a parent entity of Gundrum Trucking, Inc.  However, the DFI record for Gundrum Trucking, Inc. does not refer to HJSG Enterprises.  Moreover, a search of DFI corporate records reveals a Scott Gundrum Trucking, LLC, also listing its principal office on Arthur Road in Slinger.  For the sake of simplicity, we will refer to the entity conducting business on Arthur Road near Slinger as Gundrum Trucking.

hours of December 15.   It was not the first party hosted by Gundrum at the shed. Gundrum testified in a deposition that there was at least one prior party, but other witnesses recalled multiple prior parties.[7]

¶18  As with previous parties, Gundrum texted friends about the party and expected his friends to text or tell others, ensuring a well-attended party.   Gundrum later estimated that more than 40 partygoers came to the shed on the night of December 14.   He also estimated that 40 to 50 percent of the people were under the age of 21.

¶19  The site of the party was a pole barn approximately 40-by-60 feet in size.   It had no windows.   This shed was used by the trucking company, but it also stored some personal property belonging to Gundrum's extended family.   The property included boats, a camper, and two snowmobile trailers. Gundrum's immediate family stored snowmobiles in the shed. These snowmobiles were insured under the Gundrums' homeowner's policy.   Gundrum referred to the shed as the "toy shed" because of "all the junk that's piled in there."

¶20  A portion of the shed was set up for parties.   It was furnished with couches, chairs, a table, a Ping-Pong table, a CD player, and a refrigerator.   The law enforcement personnel who

---

[7] At his deposition, Gundrum testified that his father was aware of small gatherings of friends at the shed, but that he told Gundrum to "[u]se [his] judgment" and "to not have big parties."

responded to Schinner's injury described the atmosphere in the shed as consistent with an "underage alcohol party."

¶21 Alcohol was prevalent at the party, despite the fact that up to half of the guests were underage. Some guests brought their own alcohol; underage guests expected to obtain alcohol from people who were of legal drinking age. Gundrum purchased two cases of Busch Light beer for a friend and himself. He kept the beer in the refrigerator but admitted that it was available for people who did not bring their own alcohol to the party. Law enforcement officers reported a "large amount of alcoholic beverages" in the shed, and Gundrum was aware that guests were becoming intoxicated from the alcohol at the party. In fact, Gundrum himself stopped drinking when he realized that so many guests showed up and became intoxicated. He claimed that he wanted to monitor the situation. Nevertheless, alcohol consumption at the party continued. One of the party games, "beer pong," utilized the Ping-Pong table in the shed and encouraged more alcohol consumption.[8]

---

[8] According to Schinner's testimony at the preliminary hearing in Cecil's criminal assault case, beer pong is a game in which cups are set up on opposite ends of a Ping-Pong table. Teams of participants attempt to toss or bounce Ping-Pong balls into one of the other team's cups. If successful, the other team must drink the beer in that cup.

While there are many variations of the rules of beer pong, "the common object is the copious consumption of alcoholic beverages." Venito v. Salverson, No. 104110/08, 2011 WL 2464760, at *2 (N.Y. Sup. June 21, 2011). See also Kirchoff v. Abbey, No. WMN-10-1532, 2011 WL 4711898 at *1 n.2 (D. Md. Oct. 5, 2011) ("Beer pong is a game that encourages players to drink heavily.").

¶22  Cecil was one of the intoxicated underage guests who participated in beer pong during the party.  He was known by Gundrum and others to become belligerent when intoxicated. Gundrum testified that he knew from previous occasions that Cecil would become confrontational, had a history of picking on weaker kids, and used inflammatory language when intoxicated.

¶23  Eventually, an intoxicated Cecil started to make fun of Schinner at the party.[9]  At least twice Schinner asked Gundrum to intervene. But Gundrum's lone entreaty to Cecil to cease his abusive behavior was only temporarily successful.  Cecil returned to making fun of Schinner.

¶24  At approximately 2:30 a.m., Schinner and some of his friends left the shed and got into a car to leave the party. Cecil also left the shed to taunt Schinner.  When Schinner got out of the car, Cecil punched him twice in the face and then kicked him in the head after Schinner had fallen to the ground. Schinner was seriously injured in the assault.

¶25  About a half hour later, Washington County Sheriff deputies and medical personnel were dispatched to Gundrum Trucking in response to an anonymous phone call about a physical altercation and an injured male.  Deputies had trouble locating Schinner because other guests had carried him inside the shed, which had no windows "to peer into," and no one in the shed would answer the door.  Eventually, law enforcement and medical

---

[9] According to various accounts by Schinner and witnesses, Cecil referred to Schinner as a "pussy," "homo," and "fag."

personnel gained entry and treated Schinner for his injuries.[10] The sheriff's report noted that once law enforcement gained access to the shed, party guests scattered and hid on top of and behind a motorhome parked in the shed.

## II. PROCEDURAL HISTORY

¶26  Schinner sued Gundrum and his insurer, West Bend, for his injuries.  The Second Amended Complaint alleged, in part:

> 6.   Defendant Gundrum knew and expected, based on a similar party held there months earlier, that individuals he invited would invite other youths, who in turn would invite others.
>
> 7.   Defendant Gundrum knew and expected that a substantial number of individuals, 40%-50% of those in attendance, would be under the legal drinking age. The underage attendees at the party also knew that alcoholic beverages would be available for their consumption.

---

[10] Schinner testified at the preliminary hearing in Cecil's criminal case that he suffered spinal cord damage as a result of the assault, and while Schinner has regained some movement in his arms and legs, he is "considered quadriplegic."

The record does not indicate what criminal charges Cecil faced as a result of the Schinner assault.  The investigating sheriff's deputy indicated in his supplemental report on the assault that he would be requesting charges against Cecil for battery, with intent to cause either substantial or great bodily harm, contrary to Wis. Stat. § 940.19(2) (2007-08).  The deputy also recommended a hate crime penalty enhancer under Wis. Stat. § 939.645(1)(b) (2007-08).

According to Consolidated Court Automation Programs (CCAP) records, Cecil pled no contest to a charge of substantial battery with intent to cause bodily harm, contrary to Wis. Stat. § 940.19 (2007-08).  Another charge, second-degree recklessly endangering safety, contrary to Wis. Stat. § 941.30(2) (2007-08), was dismissed but read in.

. . . .

12. Defendant Michael Gundrum realized that the number of attendees, their age, and their intoxication level could lead to fights or arguments, and undertook the responsibility to monitor and supervise the party.

¶27 Schinner's first claim in the Second Amended Complaint alleged a statutory violation in serving alcohol to minors. It stated in part:

21. On December 14th and 15th, 2008, Gundrum "procured" alcohol beverages for Cecil as that term is used in Chapter 125 of the Wisconsin Statutes or sold, dispensed[,] or gave away alcohol beverages to Cecil a[s] those terms are used in Chapter 125 of the Wisconsin Statutes.[11]

22. Further, on December 14th and 15th, 2008, Gundrum committed affirmative acts which encouraged, advised and assisted Cecil in his consumption of alcohol.

23. On December 14, 2008, Gundrum knew that Cecil had not attained the legal drinking age.

24. On December 14th and 15th, 2008, the consumption of beer by Cecil was a substantial factor in causing injury to plaintiff Marshall Schinner.

¶28 Schinner's second claim in the Second Amended Complaint alleged a breach of duty as a party host that ultimately led to Schinner's injuries.

¶29 West Bend moved the circuit court for "separate trials on the issues of insurance coverage and liability and a stay of proceedings on liability pending resolution of insurance

---

[11] Gundrum pled no contest to a charge of selling or dispensing alcohol to underage persons, contrary to Wis. Stat. § 125.07(1)(a) (2007–08).

coverage issues."[12]    After conducting discovery, West Bend moved for summary judgment.

¶30    The circuit court granted West Bend's motion, concluding that there was no occurrence because "[t]here is no allegation of any accidental conduct. . . .    [A]ny acts on the part of . . . Gundrum were intentional, namely his providing of alcoholic beverages to underaged persons."    In addition, the circuit court ruled that the location exclusion in the homeowner's policy was applicable "because the injury did not occur at an insured location."

¶31    The court of appeals reversed.    Schinner v. Gundrum, 2012 WI App 31, 340 Wis. 2d 195, 811 N.W.2d 431.    The court of appeals focused upon the assault on Schinner rather than on Gundrum's actions in determining whether there was an occurrence.    Id., ¶10.    Furthermore, the court of appeals focused upon whether the assault was an accident from the standpoint of the injured party——Schinner——although the court said it would have determined that there was an occurrence even if the assault were viewed from the standpoint of Gundrum, the insured.    Id., ¶¶10, 15.

¶32    The court of appeals cited three decisions by this court to support its analysis that, "for purposes of determining

---

[12] "Both the insurer and the insured have the right to have the court resolve the issue of coverage separate from any trial on liability." Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶26, 311 Wis. 2d 548, 751 N.W.2d 845; see also 2 Arnold P. Anderson, Wisconsin Insurance Law § 7.39, at 39 (6th ed. 2012).

whether an assault is an 'accident' or 'accidental' under an insurance policy, the assault and resulting injuries must be viewed from the standpoint of the person injured." Id., ¶11 (citing Tomlin v. State Farm Mut. Auto. Liab. Ins. Co., 95 Wis. 2d 215, 219, 222, 290 N.W.2d 285 (1980); Fox Wis. Corp. v. Century Indem. Co., 219 Wis. 549, 551, 263 N.W. 567 (1935); Button v. Am. Mut. Accident Ass'n, 92 Wis. 83, 85, 65 N.W. 861 (1896)). The court concluded that the assault was an accident from Schinner's standpoint and that this triggered coverage for Gundrum under the homeowner's policy. Id., ¶15. The court acknowledged that its conclusion appeared to conflict with Estate of Sustache v. American Family Mutual Insurance Co., 2008 WI 87, 311 Wis. 2d 548, 751 N.W.2d 845, which viewed the question of whether an assault was an accident from the standpoint of the insured, but the court stated that "the outcome of the analysis is the same when viewed from either vantage point." Schinner, 340 Wis. 2d 195, ¶16.

¶33 The court of appeals also concluded that the exclusion for non-insured locations in the homeowner's policy did not apply. Citing Newhouse v. Laidig, Inc., 145 Wis. 2d 236, 426 N.W.2d 88 (Ct. App. 1988), the court of appeals determined that Schinner's injury did not "'aris[e] out of' the shed under the terms of the policy because, while [the shed] was the undisputed physical situs of injury, no particular condition of the premises correlates to the basis of liability for the injury." Id., ¶28 (emphasis added).

13

¶34 West Bend petitioned this court for review, which we granted on June 13, 2012.

### III. STANDARD OF REVIEW

¶35 The interpretation of an insurance contract is a question of law which this court reviews de novo. Everson v. Lorenz, 2005 WI 51, ¶10, 280 Wis. 2d 1, 695 N.W.2d 298.

¶36 "We review a grant of summary judgment de novo, relying on the same methodology as the circuit court." Estate of Sustache, 311 Wis. 2d 548, ¶17 (citing Doyle v. Engelke, 219 Wis. 2d 277, 283, 580 N.W.2d 245 (1998)). Summary judgment is proper where the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2) (2009-10); Estate of Sustache, 311 Wis. 2d 548, ¶17.

### IV. DISCUSSION

¶37 When determining whether an insurance policy provides coverage, a court first looks to the initial grant of coverage. Estate of Sustache, 311 Wis. 2d 548, ¶22; Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶14, 342 Wis. 2d 311, 818 N.W.2d 819. Normally, if the court determines that the policy was not intended to cover the asserted claims, it is not necessary to examine the policy's exclusions. Estate of Sustache, 311 Wis. 2d 548, ¶22. "If the court determines that the initial grant of coverage does cover the type of claim presented, the second step requires the court to examine the policy's exclusions to determine whether coverage has been withdrawn by an exclusion." Wadzinski, 342 Wis. 2d 311, ¶14

14

(citing <u>Am. Family Mut. Ins. Co. v. Am. Girl, Inc.</u>, 2004 WI 2, ¶24, 268 Wis. 2d 16, 673 N.W.2d 65).   "[I]f coverage for the claim has been withdrawn by an exclusion, the court examines any exceptions to that exclusion that might reinstate coverage for the claim."  <u>Id.</u>

¶38  We interpret an insurance contract as it would be understood by a reasonable person in the position of the insured.   <u>Am. Girl</u>, 268 Wis. 2d 16, ¶23.   In interpreting insurance policy language, we seek to "give effect to the intent of the contracting parties."   <u>Id.</u> (citing <u>Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.</u>, 2000 WI 26, ¶23, 233 Wis. 2d 314, 607 N.W.2d 276).

### A. Was There an "Occurrence"?

¶39  The Gundrums' homeowner's policy states:

A. Coverage E – Personal Liability

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "<u>occurrence</u>" to which this coverage applies, we will:

1.  Pay up to our limit of liability for the damage to which an "insured" is legally liable. . . .

2.  Provide a defense at our expense by counsel of our choice . . . .

(Emphasis added.)  As noted previously, the homeowner's policy defines an occurrence as "an <u>accident</u>, including continuous or repeated exposure to substantially the same general harmful conditions . . . ." (Emphasis added.)  The homeowner's policy does not define the term "accident."

¶40 Our first task in this analysis is to determine from whose standpoint an alleged accident should be viewed: the injured party or the insured? We then must determine whether the facts alleged in the Second Amended Complaint constitute an occurrence or accident covered under the policy.

1. From Whose Standpoint Should an Accident be Viewed?

¶41 Liability insurance policies, like the homeowner's policy in this case, typically contain a provision in which the insurer agrees to indemnify the insured against liability resulting from claims for bodily injury or property damage caused by an occurrence or accident. However, insurance treatises indicate that the definition of "occurrence" in standard liability policies has changed over time.

¶42 Before 1966 standard insurance liability policies did not contain an occurrence requirement. Instead, policies "required proof that the bodily injury or property damage was the result of an 'accident' which was interpreted to mean a sudden, identifiable event." 3 Martha A. Kersey, New Appleman on Insurance Law Library Edition § 18.02[6][a] (Jeffrey E. Thomas & Francis J. Mootz, III, eds., 2012). Standard liability policies were changed in 1966 to include the word "occurrence," which was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Id.

¶43 In 1986 the definition was changed again, this time removing the phrase "not expected or intended from the

16

standpoint of the insured" and moving that phrase to the intentional acts exclusion in the liability policy.  See id.

¶44  Assaults, given their intentional nature, would seem never to constitute an occurrence under a general liability policy.  However, "courts have taken or adopted two divergent positions as to from whose perspective the assault is to be viewed in determining whether it constitutes an 'accident'." Annotation, Liability Insurance: Assault as an "Accident," or Injuries Therefrom as "Accidentally" Sustained, Within Coverage Clause, 72 A.L.R. 3d 1090, 1095 (1976); see also 9 Steven Plitt, Daniel Maldonado & Joshua D. Rogers, Couch on Insurance § 127:21 (3d ed. 2008).  Some courts have held that this determination should be made from the standpoint of the injured party, while other courts have held that the determination must be made from the standpoint of the assailant who is often——but not always—— the insured.

¶45  Schinner urges us to decide the question of whether an "accident" took place from the standpoint of the injured party. At oral argument, counsel for Schinner asserted that if the language "expected or intended from the standpoint of the insured" is not present in the definition of occurrence, then, as a default rule, the occurrence must be viewed from the standpoint of the injured party.  Schinner and the court of appeals both look to Button, Fox, and Tomlin as Wisconsin precedent on point.  We examine each case in turn.

¶46  In Button, the insured plaintiff was injured by the "intentional discharge of a firearm" directed at him by an

17

unknown person. Button, 92 Wis. at 84. The policy at issue, an accident policy, insured the plaintiff against "death or injuries through 'external, violent, and accidental means,'" but contained an exclusion for, among other things, intentional injuries. Id. at 84-85. The Button court concluded that "an injury intentionally inflicted on the insured person by another is an 'accidental injury,' when such injury is unintentional on the part of the insured." Id. at 85 (citation omitted). It is important to reiterate that, in Button, the injured party was also the insured party. Id. at 84-85.

¶47 In Fox, an insurer refused to indemnify an insured theater when one of the theater's employees assaulted a patron and the patron sued the theater for damages. Fox, 219 Wis. at 550 (summary of the case). Citing Button, the Fox court held that "[w]hether or not an injury is accidental under the terms used in the policy here involved is to be determined from the standpoint of the person injured." Id. at 551. Thus, Fox's holding misconstrued Button by substituting the term "injured" for "insured." While the Button plaintiff was both the injured and insured, Fox's holding focused exclusively on the injured party's perspective.[13]

---

[13] The court later explained the theater's position:

> The appellant is subject to the liability for damages flowing from the tortious conduct of its employee. This liability is imposed upon [the] assured by law under the rule of respondeat superior. Although the appellant may be held liable for such tort, it cannot be said that it committed the assault,

¶48 Finally, in Tomlin this court concluded that injuries sustained by a state patrol officer who was stabbed by an insured motorist during a traffic stop were "caused by accident," within the meaning of the insured assailant's automobile liability policy. Tomlin, 95 Wis. 2d at 222. The Tomlin court stated:

> In determining whether an injury is "caused by accident" or "accidentally sustained" within the coverage afforded by a liability insurance policy, the courts have been primarily concerned with the question of whether the occurrence is to be viewed from the standpoint of the injured person or the insured. The majority of courts, including this court, when considering the question, have held or recognized that the determination of whether injuries resulting from an assault were caused by "accident" or "accidentally sustained" must be made from the standpoint of the injured party, rather than from that of the person committing the assault.

Id. at 219 (citing Annotation, Liability Insurance: Assault as an "Accident," or Injuries Therefrom as "Accidentally" Sustained, Within Coverage Clause 72 A.L.R.3d 1090 (1976); 12 George J. Couch, Ronald A. Anderson, & Mark S. Rhodes, Couch on Insurance § 45:38, at 133–34 (2d ed. 1959)) (emphasis added).

¶49 On the surface, Tomlin stands for the proposition that an accident should be viewed from the standpoint of the injured party, not the insured. But there is a factual caveat. In Tomlin, the injured officer was stabbed by a minor. The officer

---

nor that it authorized it. Thus the appellant has not placed itself outside the terms of the policy . . . .

Fox Wis. Corp. v. Century Indem. Co., 219 Wis. 549, 551-52, 263 N.W. 567 (1935).

19

sued the minor and the minor's parents.  Under Wisconsin law, Wis. Stat. § 343.15(2) (1977-78), "Any . . . wilful misconduct of a person under the age of 18 years when operating a motor vehicle upon the highways is imputed to the parents . . . .  The parents . . . [are] jointly and severally liable with such operator for any damages caused by such . . . wilful misconduct."    See also Wis. Stat. § 895.035 (1977-78). Consequently, the court may have perceived the parents as being in the same position as the theater in Fox.

¶50  While the decisions in Button and Fox make good sense, the rule stated in Tomlin comes out of an extraordinary situation and is distinguishable on that basis.

¶51 Analyzing an accident from the standpoint of the injured party goes against recent insurance decisions in Wisconsin, which considered whether the insured acted with lack of intent in a particular incident.  See, e.g., Estate of Sustache, 311 Wis. 2d 548, ¶52; Am. Girl, 268 Wis. 2d 16, ¶¶37-49; Smith v. Katz, 226 Wis. 2d 798, 819-21, 595 N.W.2d 345 (1999); Bruner v. Heritage Cos., 225 Wis. 2d 728, 737-38, 593 N.W.2d 814 (Ct. App. 1999); Kalchthaler v. Keller Constr. Co., 224 Wis. 2d 387, 397, 591 N.W.2d 169 (Ct. App. 1999); cf. 43 Am. Jur. 2d Insurance § 674 (2003) ("The determination of whether an injury resulted from an accident within an occurrence clause of a liability policy is made from the standpoint of the insured.").  This approach is consistent with the idea that a court should interpret an insurance policy from the standpoint of a reasonable person in the position of the insured.

20

_Wadzinski_, 342 Wis. 2d 311, ¶11.  Moreover, when interpreting an insurance contract a court should give effect to the intentions of the parties, _Folkman v. Quamme_, 2003 WI 116, ¶12, 264 Wis. 2d 617, 665 N.W.2d 857, not the intent of a third party.

¶52  Therefore, we hold that when an insured is seeking coverage, the determination of whether an injury is accidental under a liability insurance policy should be viewed from the standpoint of the insured.

### 2. Determining Whether an Accident Took Place

¶53  Numerous courts and commentators, both inside and outside of Wisconsin, have attempted to define and interpret the term "accident" when determining whether insurance coverage applies.  _Compare_ 9 Steven Plitt, Daniel Maldonado, & Joshua D. Rogers, _Couch on Insurance_ § 126:26 ("an accident is a distinctive event that is unforeseen and unintended") _with_ 1 Arnold P. Anderson, _Wisconsin Insurance Law_ § 5.18, at 26 (6th ed. 2012) ("The difficulty comes in determining . . . what triggers the coverage.").

¶54  This court has interpreted the term "accident" in an insurance policy in previous decisions, and we look to our earlier decisions for guidance.

¶55  In _Doyle_ we reviewed an employer's alleged negligent supervision of its employees.  _Doyle_, 219 Wis. 2d at 281.  The court was called upon to interpret the term "event" in a CGL policy, which defined "event" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  _Id._ at 289.

¶56 Because the word "accident" was undefined in the CGL policy, the Doyle court looked to dictionary definitions and found that "accident" was commonly defined as "'[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'" Id. (quoting The American Heritage Dictionary of the English Language 11 (3d ed. 1992)). The Doyle court also examined the dictionary definition of negligence, which was defined as "'failure to exercise the degree of care considered reasonable under the circumstances, resulting in an unintended injury to another party.'" Id. at 289-90 (quoting The American Heritage Dictionary, supra, at 1209). The court noted that both definitions "center on an unintentional occurrence leading to undesirable results," and the court concluded that "a reasonable insured would expect . . . [a policy] provision defining 'event' to include negligent acts." Id. at 290 (emphasis added).[14]

---

[14] Relying on dram shop law in Chapter 125 of the Wisconsin Statutes, Schinner argues that furnishing alcohol to a minor in Wisconsin is negligent, not intentional, conduct. He asserts that because negligence can constitute an occurrence under an insurance policy, Doyle v. Engelke, 219 Wis. 2d 277, 290, 580 N.W.2d 245 (1998), Gundrum's furnishing of alcohol to minors was negligent and should trigger coverage.

We reject this argument. The facts alleged in a complaint or as supplemented by affidavits determine a duty to defend and trigger coverage under an insurance policy, not a plaintiff's theories of liability. See, e.g., Doyle, 219 Wis. 2d at 284-85 (stating that the insurer has a duty to defend where the plaintiff's complaint alleges facts that would give rise to liability under a policy); Berg v. Schultz, 190 Wis. 2d 170, 177, 526 N.W.2d 781 (Ct. App. 1994) (courts "must focus on the incident or injury that gives rise to the claim, not the plaintiff's theory of liability").

¶57 In American Girl we interpreted a CGL policy to determine whether the policy provided coverage for property damages resulting from an alleged occurrence. Am. Girl, 268 Wis. 2d 16, ¶¶1-3. In American Girl a subcontractor "gave faulty site-preparation advice to a general contractor in connection with the construction of a warehouse. As a result, there was excessive settlement of the soil after the building was completed," and the warehouse was so damaged that it had to be torn down. Id., ¶3. Once again, the CGL policy defined occurrence as an accident, but the policy did not define accident. Id., ¶37.

¶58 As in Doyle, the American Girl court turned to dictionaries for help in interpreting the term accident:

> The dictionary definition of "accident" is: "an event or condition occurring by chance or arising from unknown or remote causes." Webster's Third New International Dictionary of the English Language 11 (2002). Black's Law Dictionary defines "accident" as follows: "The word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." Black's Law Dictionary 15 (7th ed. 1999).

Id. (emphasis added). In light of these definitions, the American Girl court concluded that the circumstances in the case

---

Furthermore, an allegation of negligence is not the equivalent of an occurrence. Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶45, 268 Wis. 2d 16, 673 N.W.2d 65 ("Doyle did not . . . equate the term 'accident,' as used in the CGL policy, with negligence as a form of legal liability; we simply held that negligent acts were 'accidental' within the meaning of the CGL's definition of 'event.'").

constituted an occurrence under the policy: the property damage was "clearly not intentional," nor was it "anticipated by the parties." Id., ¶38. More specifically:

> The damage to the [warehouse] occurred as a result of the continuous, substantial, and harmful settlement of the soil underneath the building. [The] inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated, or expected. We conclude that the circumstances of this claim fall within the policy's definition of "occurrence."

Id. (emphasis added) (footnote omitted).[15]

¶59 In Everson we reviewed whether misrepresentation in a real estate transaction constituted an occurrence under a CGL policy. Everson, 280 Wis. 2d 1, ¶2. After the transaction, the buyers determined that a portion of their lot was in a 100-year floodplain, contrary to the representations made by the seller in a real estate condition report given to the buyers.[16] Id., ¶5. As a result, the buyer was unable to build on that location. Id. The buyer sued the seller, but the seller's insurer argued that it had no duty to defend and indemnify under its CGL policy to the seller. Id., ¶7. The CGL policy covered

---

[15] See also Stuart v. Weisflog's Showroom Gallery, Inc., 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448. The Stuart court adopted American Girl's requirement that the underlying causal event must be accidental for the event to be an occurrence, not the unexpected result. Id., ¶40. "It does not matter whether [the defendants] intended a specific result; what matters is whether the cause of the damage was accidental." Id.

[16] The real estate condition report appeared to have contained a typographical error that the buyer relied upon when purchasing a particular lot. Everson v. Lorenz, 2005 WI 51, ¶16, 280 Wis. 2d 1, 695 N.W.2d 298.

property damage caused by an occurrence. The policy defined the term "occurrence" as an accident, but "accident" was not defined. Id., ¶¶12, 15. Thus, the Everson court had to determine whether the seller's alleged misrepresentation constituted an accident and triggered coverage under the CGL policy.

¶60 Noting that "this court has often relied on dictionary definitions for assistance," the Everson court looked to Black's Law Dictionary, which defined an "accident" as "'[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated.'" Id., ¶15 (quoting Black's Law Dictionary 15 (7th ed. 1999)). The court also cited the Doyle court's definition of "accident": "'[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'" Id. (quoting Doyle, 219 Wis. 2d at 289).

¶61 Ultimately, the Everson court concluded that the seller's misrepresentations did not constitute an accident. Id., ¶18. The seller's misrepresentation required a "degree of volition inconsistent with the term accident." Id., ¶19 (citing Sheets v. Brethren Mut. Ins. Co., 679 A.2d 540, 552-53 (Md. 1999) (Karwacki, J., dissenting)) (emphasis added). The seller may have made a mistake in a real estate condition report when he initially placed the lot outside of the 100-year floodplain. Id., ¶¶5 n.3, 22. However, the seller later acted with volition when he intentionally gave this information to the buyer. Id., ¶22 (emphasis added). "[S]tripped to its essentials," an

25

action, not an accident, caused the seller to give misleading information to the buyer. Id.

¶62 Finally, in Estate of Sustache, we reviewed an occurrence case somewhat similar to this matter. Estate of Sustache involved a fight at an underage drinking party in which the insured punched a victim, causing the victim to fall to a curb and sustain severe injuries that ultimately led to death. Estate of Sustache, 311 Wis. 2d 548, ¶5. There was no dispute that the insured assaulter intended to strike the victim, but there was also no dispute that the insured assaulter did not intend the blow to be fatal. Id. The estate and parents of the victim sued the assaulter and his insurer, American Family, which moved for summary judgment on the grounds that, inter alia, the damages were not caused by an occurrence under the policy. Id., ¶¶6, 12. Once again, the policy defined an "occurrence" as an accident, but the policy did not define the term "accident." Id., ¶9.

¶63 After reviewing our previous analysis of the term "occurrence" in Doyle, American Girl, Everson, and Stuart v. Weisflog's Showroom Gallery, Inc., 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448, we held in Estate of Sustache that the allegations in the complaint, supplemented by the deposition of the insured assaulter, could not "reasonably be construed to constitute a covered claim" under the American Family policy. Id., ¶51.

¶64 Considering one of the Doyle definitions of "accident"——"an unintentional occurrence leading to undesirable

26

results"——we concluded that the insured's actions did not constitute an accident.  The insured may not have intended the unexpected result, but he did intend to throw the punch that ultimately led to the death of the victim.  Id., ¶¶52–53 (quoting Doyle, 219 Wis. 2d at 290).  American Girl's definition of "accident" also reinforced our conclusion.  The means or cause of the victim's bodily harm was an intentional punch; the punch could not be said to occur by chance or arise from an unknown or remote cause.   Id., ¶53 (citing Am. Girl, 268 Wis. 2d 16,   ¶37).   We  also  noted  that,  like  the misrepresentation in Everson, the insured assaulter's action required a degree of volition inconsistent with the term "accident."  Id., ¶54 (citing Everson, 280 Wis. 2d 1, ¶19).

¶65 With the above cases and their interpretations of an insurance policy's requirement of an "occurrence" or "accident" in mind, we turn to the facts of this case.

¶66 At the outset, we must determine where to focus our analysis.  More specifically, what is the injury-causing event in this case?  Is it Cecil's assault on Schinner, or is it the actions of Gundrum in hosting the party?  In this case, as opposed to a case against Cecil, Schinner's Second Amended Complaint alleges that wrongful conduct by Gundrum caused his bodily injury.  Normally, the allegations in a complaint are the allegations an insurer must defend or indemnify, and it is these alleged facts that determine whether there is coverage under the homeowner's policy.  See Doyle, 219 Wis. 2d at 284-85.  Here, the circuit court considered additional evidence, but the

27

additional evidence did not undermine or change the thrust of the allegations in the complaint.

¶67 There is no question that Cecil intended to assault Schinner.  Schinner does not contend that Gundrum intended or approved of Cecil's assault or that he ever wanted to see Schinner injured.

¶68 However, the allegations in Schinner's Second Amended Complaint and other evidence make clear that Gundrum took a number of intentional actions that ultimately caused Schinner's bodily injury.  Gundrum intended to host the party and, based on the experience from an earlier party he hosted, he intended that the "individuals he invited would invite other youths, who would in turn invite others."  Gundrum intended that minors attend his party.  He "knew and expected that a substantial number of individuals" were under the legal drinking age and that these underage attendees would consume alcohol made available to them at the party.  By making the arrangements for beer pong throughout the evening, Gundrum actively promoted heavy drinking at the party.  In violation of Chapter 125 of the Wisconsin Statutes, Gundrum procured alcohol for Cecil and other minors. Gundrum knew that Cecil was an underage individual who became belligerent when intoxicated.  Nonetheless, Gundrum "encouraged, advised and assisted Cecil in his consumption of alcohol." Gundrum's actions in hosting an underage drinking party and in procuring alcohol for Cecil and others were intentional.  See Doyle, 219 Wis. 2d at 290 (concluding that an "accident" is an "unintentional occurrence leading to undesirable results")

28

(emphasis added).  Gundrum's actions were entirely volitional. He did not host the underage drinking party by mistake, against his will, or by chance. See Everson, 280 Wis. 2d 1, ¶19.

¶69 As we stated in American Girl, "A result, though unexpected, is not an accident; the means or cause must be accidental."  Am. Girl, 268 Wis. 2d 16, ¶37 (citation omitted). Here, "the means or cause" of Schinner's bodily injury was not accidental.  The intentional, illegal procuring and serving of alcohol to Cecil exposed Schinner to harm.  Gundrum's many intentional acts were a substantial factor in causing Schinner's bodily injury.  The events leading up to the bodily injury were not remote and were not accidental.

¶70 As a general rule, where an insured acts intentionally to cause bodily injury to another, insurance coverage for the injury will not be available.  This case is more difficult because bodily injury was not intended and there was no certainty that it would occur.  On the other hand, bodily injury was hardly unforeseeable.  All the conditions for a tragic injury had been put in place, and they were put in place intentionally.  As the Michigan Supreme Court concluded in an insurance coverage case dealing with an occurrence, "when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for any resulting damage or injury, despite the lack of an actual intent to damage or injure."  Frankenmuth Mut. Ins. Co. v. Masters, 595 N.W.2d 832, 839 (Mich. 1999) (quoting Auto Club Grp. Ins. Co. v. Marzonie, 527 N.W.2d 760, 771 (Mich. 1994) (Griffin, J., concurring)).

29

¶71 Given the facts of this case, it is not reasonable to argue that a fight between intoxicated teenagers was "unexpected" or "unforeseen," Doyle, 219 Wis. 2d at 289, especially when one of the underage drinkers was known to become belligerent when he was drunk. Gundrum anticipated that something undesirable, like a fight, might happen at his party: he stopped drinking when he realized the increasing number of guests attending the party along with the amount of alcohol being consumed created a volatile situation. It is no leap of logic to conclude that Gundrum knew that a combination of underage partygoers, alcohol, and games like beer pong would create a powder keg. To aggravate this already volatile situation, Gundrum heard Schinner's pleas to intervene and stop the relentless taunting he was receiving from Cecil who had a reputation for belligerence when he was intoxicated.

¶72 Schinner urges us to adopt an approach in determining an occurrence like the approach taken by the Minnesota Supreme Court in American Family Insurance Co. v. Walser, 628 N.W.2d 605 (Minn. 2001). In that case, three youths were playing in a high school gym, when one of them, Jewison, jumped up and hung from the rim of the basketball hoop. Id. at 607. The other two pulled on Jewison's ankles several times until finally he fell and suffered bodily injury. Id. Jewison sued the other two youths, Walser and Shoemaker, but Walser's insurer, American Family, argued it had no duty to defend or indemnify Walser because there was no occurrence under Walser's homeowner's policy. Id. at 608. The definition of occurrence in the

30

American Family policy was identical to the homeowner's policy in this case——"an accident," which the policy did not define. Id. at 609.

¶73 The Minnesota Supreme Court held that "in analyzing whether there was an accident for purposes of coverage, lack of specific intent to injure will be determinative, just as it is in an intentional act exclusion analysis." Id. at 612. Thus, the court concluded that while Walser acted intentionally—— pulling at Jewison's ankles while he hung from the basketball hoop——Walser did not act with specific intent to injure Jewison, thereby constituting an occurrence and triggering coverage under the American Family policy. Id. at 613. The court also concluded that, since the three youths were merely "goofing around," that both Jewison and Walser had hung on the basketball rim before and fallen to the ground without injury, and that Walser's actions were merely impulsive actions resulting in unintentional injury, the intentional acts exclusion did not apply. Id. at 614–15.

¶74 We have two reservations about applying Walser to the present situation. First, our insurance case law does not require that an insured intend to harm, or know with substantial certainty that harm will occur, in order to determine that the harm was not an accident. An accident is "an unintentional occurrence leading to undesirable results." Doyle, 219 Wis. 2d at 290. To assess the existence of an accident, a court will focus on the "means or cause" of harm to determine whether it was truly accidental, even if the result was unexpected. Am.

31

Girl, 268 Wis. 2d 16, ¶37.  Here, there was intentional conduct in throwing the illegal underage drinking party and encouraging Cecil to drink when Gundrum had knowledge of Cecil's aggressive behavior when intoxicated.  Intent, volition, knowledge, and foreseeability are all present, consistent with our case law. Gundrum's conduct was not accidental, so no occurrence triggered coverage under the homeowner's policy.

¶75 Second, Gundrum's conduct and Schinner's injury differ greatly from the conduct and injury in Walser.  While the actions of the three youths in Walser were described as "goofing around" and "impulsive," Gundrum was doing more than "goofing around."  Gundrum planned a large drinking party, procured alcohol for minors, knew of Cecil's belligerence, and encouraged Cecil's consumption of alcohol.  We believe that the facts of this case——intentionally providing alcohol to minors, resulting in bodily injury——are closer to the facts in a Minnesota Court of Appeals case, Illinois Farmers Insurance Co. v. Duffy, 618 N.W.2d 613 (Minn. Ct. App. 2000).[17]

---

[17] The Minnesota Supreme Court's decision in American Family Insurance Co. v. Walser, 628 N.W.2d 605 (Minn. 2001), did not specifically overrule the Minnesota court of appeals decision cited by West Bend in this case, Illinois Farmers Insurance Co. v. Duffy, 618 N.W.2d 613 (Minn. Ct. App. 2000), review denied (Jan. 26, 2001).  In fact, the Walser decision did not even mention Duffy.  In Duffy, the Minnesota Court of Appeals held that the intentional act of providing alcohol to minors was wrongful conduct and did not constitute an occurrence under a homeowner's insurance policy.  Duffy, 618 N.W.2d at 615.

32

¶76 Schinner also contends that the lack of a liquor exclusion in the homeowner's policy is important in this case. He argues that since other homeowner policies contain liquor exclusions,[18] and West Bend could have put one in its policy, this court should not rewrite the contract to help West Bend avoid coverage. Schinner also points to the presence of a liquor exclusion in the CGL policy for Gundrum Trucking.[19] If West Bend anticipated liquor liability coverage under the CGL policy and specifically excluded it, he argues, then surely the homeowner's policy was expected to cover liquor liability in the absence of such an exclusion. We are not persuaded.

¶77 CGL policies typically contain an exclusion for liquor liability. See, e.g., 1 Anderson, supra, at § 5.187; 9A Lee R.

---

It is not surprising that Duffy is still good law. The Duffy court and courts in other states have found no accident, or no occurrence, under a homeowner's policy when an insured intentionally or knowingly provides alcohol to a minor and injury results. See, e.g., Am. Modern Home Ins. Co. v. Corra, 671 S.E.2d 802, 806-07 (W. Va. 2008) (holding that there is no occurrence and a homeowner's policy does not provide coverage when injury is caused by an insured's conduct in "knowingly permitting" a minor to consume alcohol on the insured's property); Allstate Ins. Co. v. J.J.M., 657 N.W.2d 181, 184 (Mich. Ct. App. 2002) (concluding that the insured "reasonably should have expected that giving minors enough alcohol to allow them to pass out would result in harm" and thus no accident giving rise to coverage existed).

[18] As an example of a homeowner's policy containing a liquor exclusion, Schinner cites Anderson v. American Family Mutual Insurance Co., 2002 WI App 315, 259 Wis. 2d 413, 655 N.W.2d 531.

[19] The written summary judgment decision in this case mistakenly placed the liquor exclusion in the homeowner's policy, not the CGL policy.

Russ, Thomas F. Segalla, Steven Plitt, Daniel Maldonado, & Joshua D. Rogers, Couch on Insurance § 129:32 (3d ed. 2005). However, these same treatises say nothing about the frequency of liquor liability exclusions in homeowner's policies. Although Schinner cites one Wisconsin case[20] to support his assertion that these exclusions are common to homeowner's policies, the absence of an exclusion does not necessarily mean the presence of coverage.

¶78 As noted above, the first step in a court's analysis of an insurance contract is to examine whether the policy provides an initial grant of coverage. See, supra, ¶37. Hence, if a given set of facts do not trigger coverage, it is not necessary to look at a policy's exclusions. West Bend could have inserted a liquor liability exclusion into the policy, but we would not have reached it under the facts of this case because Gundrum's intentional and illegal conduct did not lead to coverage.

¶79 Finally, we note the strong public policy weighing against finding an occurrence in this situation. As this court stated in Hedtcke v. Sentry Insurance Co., 109 Wis. 2d 461, 326 N.W.2d 727 (1982):

> Even where the insurance policy contains no language expressly stating the principle of fortuitousness, courts read this principle into the insurance policy to further specific public policy objectives including (1) avoiding profit from wrongdoing; (2) deterring crime; (3) avoiding fraud against insurers; and (4)

---

[20] See supra, n.18.

34

maintaining coverage of a scope consistent with the reasonable expectations of the contracting parties on matters as to which no intention or expectation was expressed.

Hedtcke, 109 Wis. 2d at 484 (citing Keeton, Insurance Law § 5.3(a) at 279 (1971)). See also 7 Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt, Couch on Insurance § 101:22 (3d ed. 2006) ("In general, it is against public policy for an insurance contract to provide coverage for the intentional or willful misconduct of an insured."); 43 Am. Jur. 2d Insurance § 478 (2003) ("Public policy does on occasion demand that a wrongdoer be forbidden to shift the cost of liability to another through insurance . . . .").

¶80 Finding an occurrence and coverage under these circumstances would allow the host to escape responsibility for his intentional and illegal actions. We would be sending the wrong message about underage drinking parties, implying that whatever tragic consequences might occur, insurance companies will be there to foot the bill. Moreover, insurance contracts are construed from the standpoint of what a reasonable person in the position of the insured would believe the contract to mean. Acuity v. Bagadia, 2008 WI 62, ¶13, 310 Wis. 2d 197, 750 N.W.2d 817; Liebovich v. Minn. Ins. Co., 2008 WI 75, ¶17, 310 Wis. 2d 751, 751 N.W.2d 764. We do not believe that a reasonable insured would expect coverage for bodily injury resulting from the hosting of a large, illegal underage drinking party.

35

¶81 We conclude that Gundrum's intentional actions in hosting a large underage drinking party——actions that were illegal——and providing alcohol to an individual known to become belligerent when intoxicated, were a substantial factor in causing Schinner's bodily injury.    These causes were not accidental.    Since there was no occurrence under the homeowner's policy, there was no initial grant of coverage to Gundrum under the policy.

B. The Exclusion for "Arising Out Of" a Non-Insured Location

¶82 Ordinarily, if we find no initial grant of coverage under an insurance policy, we end our inquiry.    See supra, ¶37. In this case, however, the court of appeals' interpretation of the non-insured location exclusion has been published and should be addressed.

¶83 The homeowner's policy contained an exclusion for bodily injury or property damage liability arising out of a premises that is not an "insured location" (or a premises used by the insured "in connection with" an "insured location.") "Coverages E and F do not apply to the following: . . . 'Bodily injury' or 'property damage' arising out of a premises: a. Owned by an 'insured'; b. Rented to an 'insured'; or c. Rented to others by an 'insured'; that is not an 'insured location'." (Emphasis added.)

¶84 The parties dispute the meaning of the phrase "arising out of."    West Bend argues that this phrase means, in the context of a general liability insurance policy, "originating from, growing out of, or flowing from." Garriguenc v. Love, 67

Wis. 2d 130, 137, 226 N.W.2d 414 (1975).   West Bend argues that the plain language of the exclusion precludes coverage because Schinner's injuries arose out of the shed and the Gundrums did not use the shed "in connection with" their insured residence. Schinner and the court of appeals disagree with this interpretation, relying on Newhouse v. Laidig, Inc., 145 Wis. 2d 236, 426 N.W.2d 88 (Ct. App. 1988).

¶85  In Newhouse, an unsupervised child was injured when he became entangled in a silo unloader.  Id. at 238.   The defendant's homeowner's policy excluded coverage for bodily injury "arising out of any premises owned or rented to any insured which is not an insured location."  Id. at 239.   The farm silo was not an insured location.  Id.

¶86  The Newhouse court found the non-insured location exclusion did not apply, and the homeowner's policy provided coverage to the farm owner.  Id. at 239-40.  Newhouse relied on a Missouri decision, Lititz Mutual Insurance Co. v. Branch. Lititz involved a similar "arising out of" exclusion, but the court held that the bodily injury in that case did not occur as a result of "a condition" of the non-insured location.  Lititz Mut. Ins. Co. v. Branch, 561 S.W.2d 371, 374 (Mo. Ct. App. 1977).  Newhouse adopted this approach: "The dispositive issue therefore is whether there is some correlation between the negligence giving rise to liability and a condition of the premises."  Newhouse, 145 Wis. 2d at 240 (emphasis added).

¶87  Newhouse did not cite the Garriguenc case, which discussed the same "arising out of" language.   The Garriguenc

37

court said: "The words 'arising out of' in liability insurance policies are very broad, general, and comprehensive; and are ordinarily understood to mean originating from, growing out of, or flowing from. All that is necessary is some causal relationship between the injury and the event [here, "property"] not covered." Garriguenc, 67 Wis. 2d at 137 (footnote omitted).

¶88 The Newhouse court provided a much narrower reading of the "arising out of" exclusion than the Garriguenc court. In effect, it attempted to overrule the Garriguenc decision. We think a better reading of the exclusion is not to exclude all liability coverage for events not on an insured premises but rather to exclude liability coverage when there is a "causal relationship" between the premises that are not insured and the insured's action or non-action giving rise to liability. Cf. St. Paul Fire & Marine Ins. Co. v. INA, 501 F. Supp. 136, 138 (W.D. Va. 1980) (stating that "arising out of" are words of much broader significance than "caused by" and are usually understood to mean "incident to or having connection with").

¶89 In this case, the homeowner's policy language is clear on its face. The policy excludes coverage for injuries arising out of a non-insured premises, not from a condition of a non-insured premises. Schinner's bodily injury clearly arose out of, or originated, or flowed from, the shed where the illegal party took place on the premises of Gundrum Trucking, a non-insured location.

¶90 In this case, a causal relationship between the shed and Schinner's injury is present. A portion of the shed was set

38

up for a social gathering, especially an underage drinking party: chairs, tables, couch, a refrigerator, a CD player, and a Ping-Pong table for beer pong.  The shed had no windows, thereby concealing the illegal activities inside.  As counsel for West Bend aptly observed at oral argument for summary judgment, "It was an illegal party. . . .  [T]hat's not the kind of thing one could have rented out the Knights of Columbus Hall to do.  Or to have done out in your front yard at your residence.  This had a causal nexus to the premises."

### C. Whether the Shed was a Premises Used in Connection With an Insured Location

¶91 Finally, Schinner advances the argument that the shed was in fact an insured location because it was used "in connection with" the Gundrum's insured residence.  Schinner points to the storage of the Gundrums' insured personal property, like snowmobiles, to turn the shed into an insured location.[21]  Such an assertion defies common sense.  If business owners were allowed to store insured personal property on their business premises and obtain insurance coverage for the premises through a homeowner's policy, there would be much less reason to obtain business insurance.  Such a result would be absurd.  Olguin v. Allstate Ins. Co., 71 Wis. 2d 160, 165, 237 N.W.2d 694 (1976) ("[I]nsurance policies should be given a reasonable

---

[21] The shed was used to store personal property for Gundrum's extended family.  If Schinner's argument were valid, the shed would be used "in connection with" more than one residence.  Tortfeasors from several residences would be able to claim coverage.

39

interpretation and not one which leads to an absurd result.");
<u>Wilson Mut. Ins. Co. v. Risler</u>, 2011 WI App 70, ¶12, 333
Wis. 2d 175, 798 N.W.2d 898 ("We reject interpretations of
insurance policies that lead to absurd results.").

V. CONCLUSION

¶92 Gundrum's actions in setting up an isolated shed for a
drinking party, procuring alcohol and expecting others to bring
alcohol, inviting many underage guests to the party, and
encouraging the underage guests to drink——especially an underage
guest known to become belligerent when intoxicated——were
intentional actions that violated the law.   Gundrum's many
intentional wrongful acts were a substantial factor in causing
Schinner's bodily injury.   Viewed from the standpoint of a
reasonable insured, Gundrum's intentional actions created a
direct risk of harm resulting in bodily injury, notwithstanding
his lack of intent that a specific injury occur.   Thus,
Schinner's bodily injury was not caused by an "occurrence"
within the meaning of the policy, and West Bend is not obligated
to provide insurance coverage for Gundrum.

¶93 Even assuming there was an occurrence under the West
Bend homeowner's policy, coverage is excluded because the injury
arose out of the use of an isolated shed for an underage
drinking party on uninsured premises.   The fact that the
Gundrums kept some personal property insured under the policy at
the shed did not make the shed a premises used in connection
with the insured's residence, as those terms are defined in the

policy.    Thus, the business shed was not an insured location triggering coverage under the homeowner's policy.

*By the Court.*—The decision of the court of appeals is reversed.

¶94 N. PATRICK CROOKS, J. *(concurring).* I agree with the result reached by the majority that the homeowner's policy does not provide coverage for Schinner's injuries under these facts. I write separately because my approach differs from both the majority opinion and that of the dissent.

¶95 I agree with the dissent that under the insurance policy at issue and our case law, including Doyle v. Engelke, 219 Wis. 2d 277, 580 N.W.2d 245 (1998), and Estate of Sustache v. American Family Mutual Insurance Co., 2008 WI 87, 311 Wis. 2d 548, 751 N.W.2d 845, Cecil's assault on Schinner constitutes an occurrence, and I join the analysis of the dissent on that issue.

¶96 However, I agree with the majority that the non-insured location exclusion applies because Schinner's injuries arose out of, originated, or flowed from a non-insured location, consistent with this court's interpretation of "arising out of" in Garriguenc v. Love, 67 Wis. 2d 130, 226 N.W.2d 414 (1975), and I join the analysis of the majority on that issue.

¶97 Accordingly, I respectfully concur.

¶98 ANN WALSH BRADLEY, J. *(dissenting).* I agree with the majority when it holds that the determination of what constitutes an "occurrence" under the insurance policy is to be analyzed from the standpoint of the insured, not the injured party. Majority op., ¶52. I part ways with the majority, however, when it fails to apply that holding.

¶99 Like the unanimous court of appeals, I conclude that the "occurrence" here is the event of an assault. The insurance policy defines an "occurrence" as an "accident."

¶100 Applying the proper analysis, the question then becomes whether the assault of Schinner by the assailant was an "accident" from the standpoint of Gundrum, the insured? As even the majority acknowledges, there is nothing in the record that suggests that Gundrum intended the assault or any subsequent injury to Schinner. See id., ¶67. Accordingly, when viewed from the standpoint of the insured, the assault was unintended and was an "accident," constituting an "occurrence" under the policy.

¶101 Instead of identifying the assault as an "occurrence," the majority's analysis simply ignores it. Rather than analyzing an "occurrence" from the standpoint of the insured, it develops a different test, conflating a discussion of negligence principles with the analysis required to interpret an undefined word in an insurance policy. Ultimately, its analysis undermines the well-established understanding that an intentional act by an insured is within the definition of an "occurrence" if the injury is unexpected and unintended.

1

¶102 In contrast to the majority, I conclude that the assault is an "occurrence" for the purposes of coverage and I further conclude that the non-insured location exclusion does not apply under these circumstances. As a result, the relevant insurance policy provides coverage for damages arising from Schinner's injuries. Accordingly, I respectfully dissent.

I

¶103 The Second Amended Complaint filed in this case identifies the assault as the occurrence. It alleges that Schinner was "kicked . . . in the head [by the assailant], causing permanent paralysis." The claims alleged against Gundrum sound in negligent supervision, negligence in failing to protect Schinner, and negligence as a matter of law.[1]

---

[1] Specifically, Schinner alleged a violation of Wis. Stat. § 125.035, which is commonly known as the "dram shop" law. It provides, in relevant part:

> (2) A person is immune from civil liability arising out of the act of procuring alcohol beverages for or selling, dispensing or giving away alcohol beverages to another person.
>
> . . . .
>
> (4)(a) In this subsection, "provider" means a person, including a licensee or permittee, who procures alcohol beverages for or sells, dispenses or gives away alcohol beverages to an underage person in violation of s. 125.07(1)(a).
>
> (b) Subsection (2) does not apply if the provider knew or should have known that the underage person was under the legal drinking age and if the alcohol beverages provided to the underage person were a substantial factor in causing injury to a 3rd party. In determining whether a provider knew or should have known that the underage person was under the legal drinking age, all relevant circumstances surrounding

¶104 Recognizing that identifying the event that should be considered the "occurrence" is critical to the coverage analysis, the majority jettisons the allegation of an "occurrence" stated in the Second Amended Complaint and asks what is "the injury-causing event in this case?" Majority op., ¶66. It answers the question by pointing to a course of conduct by Gundrum that allegedly was a cause of Schinner's bodily injury and accordingly shifts its focus to Gundrum's acts as the apparent "occurrence" without further discussion of the assault. Id.

¶105 The remainder of the majority's analysis is fixed upon developing a new objective test that examines remote theories of legal causation and events that occurred up the chain of causation. It states that "Gundrum took a number of intentional actions that ultimately caused Schinner's bodily injury." Id., ¶68. Ultimately, it concludes that "Gundrum's many intentional acts were a substantial factor in causing Schinner's bodily injury." Id., ¶69.

---

the procuring, selling, dispensing or giving away of the alcohol beverages may be considered . . . .

3

¶106 Gundrum's alleged negligent acts are repeatedly characterized as "intentional" and "illegal."[2] See id., ¶¶69, 70, 81. The majority takes Gundrum to task for failing to foresee Schinner being injured in an assault, stating that Schinner's "bodily injury was hardly unforeseeable." Id., ¶70. Because his acts were both "intentional" and "illegal" and because he should have foreseen a risk of harm, the majority concludes that there was no "accident," and thus no "occurrence." Id., ¶81.

## II

¶107 At the outset, I observe that if the majority actually applied a "from the standpoint of the insured" test, it would be compelled to conclude that there is an initial grant of coverage. Guided by public policy, however, it instead concludes that there should be no insurance coverage for hosting an illegal underage drinking party.

---

[2] In order to determine whether the relevant homeowner's policy sets forth an initial grant of coverage for the claims presented, the coverage must be compared to the allegations advanced in the Second Amended Complaint. This is the first step of a coverage determination——the court must examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage. Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶22, 311 Wis. 2d 548, 751 N.W.2d 845. If the facts do not fall within the initial grant of coverage, the analysis ends there. Id.

The Second Amended Complaint does not once use the word "intentional," whether in reference to Gundrum or in reference to the third-party assailant. It likewise makes no allegation that Gundrum in fact foresaw that a fight would occur, or that a fight was substantially certain to occur as a result of his acts.

¶108 In its quest to avoid "sending the wrong message" about underage drinking parties, the majority looks at the wrong policy. Majority op., ¶80. Instead of looking at public policy, it should be looking at the policy of insurance.

¶109 This homeowner's policy has a broad grant of coverage. To narrow that coverage, the insurer in this case had available to it several standard exclusions that are relevant here:

- An underage drinking exclusion;[3]

- An illegal acts exclusion;[4]

- An intentional acts exclusion.[5]

¶110 Despite the availability of those exclusions, the insurer chose not to include them in the Gundrums' homeowner's insurance policy or assert them as a defense to coverage. As a result of those deficits, the majority is forced to look elsewhere for support of its public policy determination. It is not the court's role in this case to send a policy message,

---

[3] A standard underage drinking exclusion would provide that "[w]e will not cover bodily injury . . . arising out of the insured's knowingly permitting or failing to take action to prevent the illegal consumption of alcoholic beverages by an underage person." 1 Susan J. Miller, Miller's Standard Insurance Policies Annotated 238.3 (Form HOEX) (6th ed. 2012).

[4] A standard illegal acts exclusion would negate coverage for "bodily injury . . . caused by violation of a penal law or ordinance committed by or with knowledge or consent of the insured." 1 Susan J. Miller, Miller's Standard Insurance Policies Annotated 238.3 (Form HOEX) (6th ed. 2012).

[5] The intentional acts exclusion in the Gundrums' homeowner's policy, which was not asserted as a coverage defense here, precludes coverage for bodily injury "which is expected or intended" by an insured even if the resulting bodily injury is "of a different kind, quality or degree than initially expected or intended . . . ."

right or wrong, about underage drinking parties or to determine whether Gundrum should "escape responsibility" under these facts. Majority op., ¶80. It is this court's role to interpret the insurance policy——the written contract entered into by the parties.

¶111 I turn next to discuss the primary flaws in the majority's opinion. Its analysis: (a) ignores the need to analyze the assault as an "occurrence," (b) develops a new objective test that conflates principles of negligence with the analysis required to interpret an undefined word in an insurance policy, and (c) undermines the well-established premise that intentional acts constitute an "occurrence" if the injury is unexpected or unintended.

A

¶112 The majority's public policy focus leads it to ignore the assault as an "occurrence." Contrary to what the majority implies when it sets up a question setting forth two potential occurrences, whether an "occurrence" exists under a set of alleged facts is not an either-or proposition requiring the

court to choose between Gundrum's acts and the assault.[6] An "occurrence" in this case is easily identified. As the court of appeals unanimously recognized, the assault itself is the correct focus of the "occurrence" when viewed from the standpoint of Gundrum. Schinner v. Gundrum, 2012 WI App 31, ¶22, 340 Wis. 2d 195, 811 N.W.2d 431.

¶113 Our prior precedent recognizes that an intentional assault by a third party can constitute an "occurrence." In Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, 311 Wis. 2d 548, 751 N.W.2d 845, this court was called upon to determine whether an intentional assault by an insured was an "occurrence," defined as an "accident." Although the court determined that the assault was not an "occurrence," Estate of

---

[6] Courts are to examine the factual circumstances alleged in the complaint to determine whether an "occurrence" exists. See, e.g., Doyle v. Engelke, 219 Wis. 2d 277, 284-285, 580 N.W.2d 245 (1998)("An insurer has a duty to defend a suit where the complaint alleges facts which, if proven at trial, would give rise to the insurer's liability under the terms of the policy."); Smith v. Katz, 226 Wis. 2d 798, 807, 595 N.W.2d 345 (1999) ("The insurer's duty arises when the allegations in the complaint coincide with the coverage provided by the policy."); United Co-op v. Frontier FS Co-op., 2007 WI App 197, ¶15, 304 Wis. 2d 750, 738 N.W.2d 578 (courts are to look to whether "some alleged event" was an "occurrence"); Glendenning's Limestone & Ready-Mix Co., Inc. v. Reimer (Glendenning's), 2006 WI App 161, ¶37, 295 Wis. 2d 556, 721 N.W.2d 704 ("we are to look at the factual circumstances of the claim to decide whether there is an 'occurrence' under the policy . . . ."); 1325 North Van Buren, LLC v. T-3 Group, Ltd., 2006 WI 94, ¶58, 293 Wis. 2d 410, 716 N.W.2d 822 ("We have repeatedly rejected the argument that insurance coverage is dependent upon the theory of liability."). The allegations are to be liberally construed in favor of coverage. Glendenning's, 295 Wis. 2d 556, ¶41.

7

_Sustache_ is distinguishable because the insured in that case was the assailant and intentionally caused the damage. _Id._, ¶31.

¶114 Further context is found in the analysis of this court in _Stuart v. Weisflog's Showroom Gallery, Inc._, 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448. The _Stuart_ court observed that courts must "focus on the incident or injury that gives rise to the claim, not the plaintiff's theory of liability." _Id._, ¶36 (quoting _Berg v. Schultz_, 190 Wis. 2d 170, 177, 526 N.W.2d 781 (Ct. App. 1994)).[7] In this case, the assault is an incident that gave rise to the claims at issue.

¶115 The above cases counsel that when viewed from Gundrum's standpoint, the "occurrence" is the assault on Schinner. _Couch on Insurance_ further supports that the assault in this case is an "occurrence" under the policy. It explains that when the insured is not an assailant in a claim involving an assault, the assault can constitute an "occurrence" when viewed from the standpoint of the insured:

> If the insured is also the assailant, the result is that there is no coverage for the assault. . . . However, where the insured is not the assailant but is instead liable based upon vicarious liability, negligent supervision, or some other negligence

---

[7] Most recently, the court of appeals in _Henshue Const., Inc. v. Terra Engineering & Const. Corp._, slip op., no. 2012AP1038 (Ct. App. May 9, 2013) analyzed whether flood damage caused by the insured "deliberately" cutting into a storm sewer pipe without providing means for storm water diversion was an "occurrence." The _Henshue Const., Inc._ court cautioned that "the correct 'occurrence' question is whether the event that caused the damage, that is, the flooding event resulting from [the insured's] failure to divert storm water, was an accident." _Id._, ¶¶60-61. Thus, the flooding event was an "occurrence." _Id._, ¶62.

theory, the assault may constitute an accident or occurrence, at least from the standpoint of the insured.

Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 127:21 (3d ed. 2012).

¶116 The majority fails to explain why the assault is not an "occurrence" when viewed from the standpoint of the insured. Instead of analyzing the assault as the "occurrence," it is simply ignored.

B

¶117 Furthermore, the majority develops a test that conflates a discussion of negligence principles with the analysis required to interpret the undefined word, "accident," in an insurance policy. In developing that test, it introduces concepts that are superficially compelling, but which really do not, or should not, drive its analysis.

¶118 The majority appears to analyze this case with an objective test in mind, looking at whether the resulting injury or damage was reasonably foreseeable to a reasonable person. That analysis is irrelevant. As the majority recognized at the outset, the question to ask is: "Did this insured expect or intend the injury or property damage?"

¶119 When applying the wrong test, the majority takes Gundrum to task for failing to foresee a fight. It appears to conclude that a failure to anticipate or foresee a foreseeable risk of harm is not an "accident." Majority op., ¶71. Yet, injury or damage that should have been anticipated or foreseen

9

but was not is the very essence of negligence.[8] Such a test conflates negligence principles with the concept of what constitutes an "accident" when interpreting this insurance policy.

¶120 Negligence is defined as when "the person, without intending to do harm, does something . . . that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property." Wis. JI-Civil 1005 (2013). In concluding that failure to anticipate or foresee harm here is not an "accident," the majority is really declaring that because negligent behavior is non-accidental, it is not covered by insurance liability policies. That makes no sense because the very reason people buy liability insurance is to cover them for their negligent acts.

¶121 In contrast, when interpreting the undefined word "accident" in a liability insurance policy, we often look to precedent for guidance. This court has set forth a definition of the term "accident": "'[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.'" Doyle v. Engelke, 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998). The definition of an "accident" by its nature

---

[8] Cirillo v. City of Milwaukee, 34 Wis. 2d 705, 711, 150 N.W.2d 460 (1967) (there is no necessity in establishing negligence that the actual harm was foreseen); see also Behrendt v. Gulf Underwriters Ins. Co., 2009 WI 71, ¶¶29-31, 318 Wis. 2d 622, 768 N.W.2d 568 (discussing foreseeability); Rockweit v. Senecal, 197 Wis. 2d 409, 423, 541 N.W.2d 742 (1995) ("Negligence is to be determined by ascertaining whether the defendant's exercise of care foreseeably created an unreasonable risk of harm to others.").

encompasses foreseeable events that were not in fact foreseen by the insured.

¶122 The <u>Doyle</u> court recognized that most negligence is accidental for the purposes of interpreting an insurance policy, stating that liability policies are "designed to protect an insured against liability for negligent acts resulting in damage to third-parties."  <u>Id.</u> at 290 (citations omitted).  In short, our prior precedent recognizes that we buy insurance to cover us when we are negligent.

¶123 The majority's focus on the fact that Gundrum should have anticipated or foreseen that "<u>something</u> undesirable" might occur is inconsistent with the definition of an "accident" set forth in <u>Doyle</u>.[9]  Majority op., ¶71 (emphasis in original).  An "accident" is an unforeseen event that causes injury or damage—not an unforeseeable risk of harm that causes injury or damage.

¶124 To the extent the majority opinion can be read to state that a risk of harm that should have been anticipated or foreseen is not an "accident" even when the risk in fact is unanticipated and unforeseen, it has rendered liability coverage illusory in many circumstances.  Defining the word "accident" so narrowly "so greatly restricts the insurer's liability as to render the policy valueless or even meaningless, and denies

---

[9] The definition of an "accident" set forth in <u>Doyle</u> likewise focuses on a failure to foresee a specific harmful event rather than a failure to foresee general risk of harm.  It requires an "unexpected . . . event" or "unforeseen incident," not an unexpected or unforeseen <u>risk</u> of an injurious event or incident.  <u>Doyle v. Engelke</u>, 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998).

11

coverage for what is the predicate of any likely liability against the insured." J. P. Ludington, <u>Liability Insurance: "Accident" or "Accidental" as Including Loss Resulting From Ordinary Negligence of Insured or his Agent</u>, 7 A.L.R.3d 1262, § 2 (1966).

C

¶125 Ultimately, the majority's analysis undermines the well-established understanding that an intentional act by an insured is within the definition of an "occurrence" if the injury or damage is unexpected and unintended. Multiple treatises discussing general principles of insurance law explain that an "occurrence" exists if the injury or damage is unexpected and unintended.

¶126 One treatise provides that the "vast majority of decisions" have held that "intentional conduct can constitute an accident if the insured did not intend or expect to cause injury." Allan D. Windt, <u>Insurance Claims & Disputes: Representation of Insurance Companies & Insureds</u>, § 11:3 (2013). It sets forth the straightforward rule embraced by the "vast majority of decisions" as follows:

> The correct analysis is as follows. An "occurrence" is defined in a typical general liability policy as an "accident." The word "accident" must be given its ordinary, dictionary definition, and the ordinary, dictionary definition of "accident" is a happening that occurs unintentionally. Accordingly, damage that the insured intended——including . . . damage that is inherent or substantially certain to result——is not covered. Damage that the insured did not intend is covered . . . . In fact . . . damage that the insured did not intend is covered regardless of whether the insured's act was volitional. A standard insuring

12

agreement requires only that the property damage/bodily injury have been caused by an occurrence/accident. It is enough if the damage/injury "occurs unintentionally" by reason of something that the insured has done.

Id. In an admonition that should give the majority pause, it further states that courts should "[k]eep in mind" that "under standard policy language, the "occurrence" is not limited to actions taken by the insured, but includes any event that causes injury/damage during the policy period." Id.

¶127 Another treatise observes that courts ordinarily examine "whether the insured intends or expects the results of its conduct, not necessarily whether the insured intends or expects the conduct itself, to determine whether there is an 'occurrence' . . . ." 1 New Appleman Law of Liability Insurance, § 1.09[1] (2d ed. 2012). Yet another states that "in order for a claim to be actionable under a liability policy, the insured's negligence must result in an 'accident' . . . [t]he word 'accident' implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune." Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 126:26 (3d ed. 2012). Many jurisdictions have accordingly focused on whether the injury or damages were unexpected and unintended. See J.P. Luddington, Liability Insurance: "Accident" or "Accidental" as Including Loss Resulting From Ordinary Negligence of Insured or his Agent, 7 A.L.R.3d 1262 (1966).

¶128 This court has long adhered to the principle that insurance policies are to be interpreted as understood by a

13

reasonable person in the position of the insured. <u>Frost v. Whitbeck</u>, 2002 WI 129, ¶20, 257 Wis. 2d 80, 654 N.W.2d 225. A reasonable person in the position of the insured understands the word "accident" to encompass unexpected and unintended injuries or damages. <u>See</u> <u>Doyle</u>, 219 Wis. 2d 277, 289 (ascribing the "common, everyday meaning" to the word "accident").

¶129 The majority's analysis not only appears to require unexpected and unintended injury or damage, but also that the acts of the insured non-assailant must be unintentional. Majority op., ¶68. Such a requirement appears to eliminate coverage anytime an insured acts with intention, regardless of whether the injury or damage is unexpected and unintended.[10]

---

[10] The majority's citation to <u>Frankenmuth Mut. Ins. Co. v. Masters (Masters)</u>, 595 N.W.2d 832 (Mich. 1999) affords it no assistance for two reasons. First, the facts of that arson case are different from those in this case. In <u>Masters</u>, the insured and his son intentionally set fire to their own clothing store so as to destroy inventory and collect the insurance proceeds. <u>Id.</u> at 835. Here, Gundrum is not a participant in anything similar to an insurance scam. The majority errs in making such a comparison.

¶130 In determining that there is no coverage under the insurance policy, the majority fails to apply its holding that the determination of what constitutes an "occurrence" is to be analyzed from the standpoint of the insured. Instead it simply ignores the assault as an "occurrence," develops an objective test that conflates a discussion of negligence principles with the analysis required to interpret an undefined word in an insurance policy, and undermines the well-established understanding that an intentional act by an insured is within the definition of an "occurrence" if the injury or damage is unexpected and unintended. By failing to apply its holding, the majority is led astray.

III

Second, the majority does not capture the Masters court's complete analysis. It reasoned that "[o]f course, 'an insured need not act unintentionally' in order for the act to constitute an 'accident' and therefore an 'occurrence.'" Id. at 838-39. To illustrate its analytical framework, it gave an example of a fire that was started by a faulty electric cord on a coffeemaker owned by the insured. Id. at 839 (quotation omitted). It stated that "there is no doubt that [the insured] purposely plugged in the coffeemaker and turned on the switch," and acted "intentionally." Id. (quotation omitted.) Nevertheless, "[t]he fire remains an accident and the act constitutes an occurrence . . . because at the time of the insured's purposeful act he had no intent to cause harm. The act of plugging in the coffeepot is not a sufficiently direct cause of the harm, and the fire in this example is an accident." Id. (quotation omitted.)

Thus, Masters not only does not help the majority, it undermines the analysis. Masters counsels in favor of finding an "occurrence" in this case. Gundrum is not like the insured that intentionally set a fire hoping to cause damage and thereby collect insurance proceeds. Instead he is like the insured who plugged in a faulty coffeepot——he had no intent to cause harm, and the assault is an accident from his standpoint. Id.

15

¶131 Even though the majority's coverage analysis should end with its determination that there is no coverage, it nevertheless proceeds to analyze whether coverage should be denied because of an exclusion for bodily injury or property damage liability "arising out of a premises" that is not an insured location. Majority op., ¶¶82, 83. The majority concludes for the second time that there is no coverage.

¶132 In contrast to the majority, I apply the tried and true principles of coverage examination and conclude that coverage is not excluded by the non-insured location exclusion. I look first to determine whether there is a grant of coverage. Estate of Sustache, 311 Wis. 2d 548, ¶22. If there is a grant of coverage under the facts alleged, I must determine whether an exclusion applies. Id., ¶23. If an exclusion applies, I then must determine whether an exception to the exclusion reinstates coverage. See id.

¶133 The Gundrums' homeowner's policy provides coverage for "bodily injury" or "property damage" that is "caused by an 'occurrence.'" It provides a basic grant of coverage in which the insurer agreed to pay all sums that Gundrum is legally obligated to pay as damages because of bodily injury or property damage caused by an "occurrence":

> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies . . . .

¶134 An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," but the word "accident" is not

16

defined in the policy. This basic grant of coverage is substantially similar to countless standardized "occurrence"-based liability insurance policies that are purchased by individuals and businesses throughout the state. See 1 New Appleman Law of Liability Insurance, § 1.07[2] (2d ed. 2012).

¶135 In order to fall within the grant of coverage, the Second Amended Complaint must allege facts showing that Schinner's bodily injury was caused by an "occurrence," which is defined as an "accident." For the reasons discussed above, I conclude that the assault was an "occurrence" when viewed from Gundrum's standpoint. Because the assault was an "occurrence," the allegations in the Second Amended Complaint fall within the policy's grant of coverage.

¶136 Having determined that the assault is an "occurrence," the next step is to determine whether an exclusion applies. Estate of Sustache, 311 Wis. 2d 548, ¶23. The only exclusion argued to apply in this case is a non-insured location exclusion, which excludes bodily injury "arising out of a premises" that is not an "insured location."[11] An "insured location" is defined in part as "[t]he residence premises," the "part of other premises, other structures and grounds used by you as a residence," and any premises used by the insured "in connection" with the premises described in the policy.

¶137 The court of appeals in Newhouse v. Ladig, Inc., 145 Wis. 2d 236, 426 N.W.2d 88 (Ct. App. 1988) addressed the same

_____

[11] There is no liquor liability exclusion in the Gundrums' policy. Likewise, no one argues that an exclusion precluding coverage for intentional acts applies.

17

issue before this court today——what is the meaning of the phrase "arising out of a . . . premises." Its analysis is instructive in evaluating whether the non-insured location exclusion applies in this case.

¶138 Under the interpretation adopted in Newhouse, the non-insured location exclusion applies to bodily injuries "related to conditions of the premises on which an accident or occurrence takes place." Id. at 239. It does not, however, apply to "insureds' tortious acts occurring on uninsured lands." Id. The ultimate test for whether there was bodily injury or property damage "arising out of a . . . premises" is "whether there is some correlation between the negligence giving rise to liability and a condition of the premises."[12] Id. at 240.

¶139 Thus, under Newhouse, the facts alleged must indicate that there was some correlation between Gundrum's negligence giving rise to liability and a condition of the premises on which the assault occurred. Here, however, no condition of the shed itself or the surrounding premises is alleged to correlate with Gundrum's alleged negligence. The only arguable correlation between Gundrum's alleged negligence and the shed is that Gundrum's alleged negligence occurred at an underage

---

[12] In interpreting a non-insured location exclusion, the Newhouse court relied upon Wisconsin's "policy of strictly interpreting exclusionary clauses." 145 Wis. 2d at 242. It observed that "if the [insurance] company had intended to geographically limit coverage for tortious personal conduct, 'it could simply have provided that the exclusion ran to an accident 'occurring on' other owned premises.'" Id. (quotation omitted).

drinking party hosted by Gundrum on the premises where the shed was located.

¶140 Such a tenuous connection to the premises is not enough to fall within the non-insured location exclusion. The Newhouse court soundly rejected the argument that tortious acts occurring on a non-insured premises are excluded from coverage:

> It makes no difference whether the insured owns the premises on which his tortious act takes place. Under the policy's terms, there is floating coverage for the insured's tortious personal acts wherever he might be. The dispositive issue is therefore whether there is some correlation between the negligence giving rise to liability and a condition of the premises.

Id. at 240. Like Newhouse, it makes no difference here that the alleged tortious acts merely occurred on a non-insured premises. The exclusion is therefore inapplicable and no analysis of any exceptions to the exclusion is required. Estate of Sustache, 311 Wis. 2d 548, ¶23.

¶141 Because facts alleged in the Second Amended Complaint fall within the policy's grant of coverage and because coverage is not excluded by the non-insured location exclusion, I conclude that the homeowner's policy provides coverage in this case. Accordingly, I respectfully dissent.

¶142 I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent. I am also authorized to state that JUSTICE N. PATRICK CROOKS joins Part II of this dissent.

19